[No. H006093. Sixth Dist. June 5, 1991.]

CAROLYN WANLAND, Plaintiff and Appellant, v.
LOS GATOS LODGE, INC., Defendant and Appellant.

1508

1510

1512

COUNSEL

Diepenbrock, Wulff, Plant & Hannegan, Dennis R. Murphy, Brodovsky & Brodovsky and Donald M. Wanland, Jr., for Plaintiff and Appellant.

Devereaux Rendler, Frank A. Jelinch, Thoits, Love, Hershberger & McLean and William J. McLean for Defendant and Appellant.

OPINION

AGLIANO, P. J.—Los Gatos Lodge, Inc. (the Lodge) appeals from a judgment entered on a jury verdict of $150,000 in favor of Carolyn Wanland in her action for constructive wrongful termination. The Lodge contends plaintiff's action is preempted by federal labor law and asserts error in several of the trial court's evidentiary rulings and in the giving of a punitive damage instruction to the jury. Plaintiff cross-appeals, urging error in a ruling *in limine* excluding evidence she contends was pertinent to her claim that two other employees of the Lodge intentionally interfered with her employment contract. We find no reversible error and therefore affirm.

*Factual Background*

Carolyn Wanland began working for the Lodge in October 1980 as a front desk clerk. In time she became the assistant to the Lodge's catering manager and then was named director of sales and marketing. When the catering manager retired, in April 1985, plaintiff was promoted to that position.

At the outset of her employment at the Lodge, plaintiff joined the Hotel-Motel Restaurant Employees and Bartenders Union, Local 19 (the Union). As a front desk clerk, plaintiff was covered by the terms of a collective bargaining agreement (CBA) between the Lodge and the Union. The CBA provided, inter alia, for termination only on just cause. The Lodge also had a policy of termination only on just cause for its nonunion employees.

When plaintiff became catering manager, Dr. Norman McFate, the owner of the Lodge, asked her to resign her union membership. Plaintiff refused to do so. She remained a member of the Union until after leaving her employment at the Lodge.

The catering department at the Lodge had fallen into a state of disarray during the tenure .of plaintiff's predecessor. McFate expected that the

necessary reorganization would take about six months. After plaintiff had worked for only 10 weeks as catering manager, however, William Houd, the manager of the Lodge, removed her from the position. He informed her that she would be reassigned with no loss of salary or benefits, and asked her where else in the Lodge she wished to work. Plaintiff refused the reassignment and resigned.

Plaintiff sued the Lodge, asserting numerous causes of action. She named McFate and Houd as individual defendants in her cause of action for intentional interference with contractual relations. All but two of the original causes of action (including the claim against McFate and Houd for interference with contract) were dismissed on motions. The Lodge unsuccessfully sought dismissal of the entire action on the basis of the preemptive effect of section 301 of the Labor Management Relations Act (LMRA) (29 U.S.C. § 185(a).) The remaining claims—for breach of employment contract and breach of the implied covenant of good faith and fair dealing—proceeded to trial before a jury.

Plaintiff's theory of the case was that she was constructively terminated without just cause in violation of rights implied in her employment contract. She contended that the true reason for her termination was not, as asserted by the Lodge, poor job performance but rather the undue influence exerted on Houd by Janet O'Keefe, a fellow employee. Plaintiff sought to prove that O'Keefe and Houd had a close personal relationship, that O'Keefe disliked plaintiff, and that O'Keefe influenced Houd to terminate plaintiff. In a pretrial ruling *in limine,* the trial court limited inquiry into the Houd-O'Keefe relationship, permitting plaintiff to adduce evidence of the existence of such a relationship only through a date 30 days after Wanland's termination. Both plaintiff and the Lodge complain the ruling was erroneous and prejudicial.

The jury returned a verdict in plaintiff's favor, finding the Lodge liable for $150,000 in general damages. The jury was instructed as to the conditions under which it could award punitive damages, but awarded none.

### Discussion

1. *Plaintiff's Action Was Not Preempted by Federal Labor Law.*

Both at trial and at an earlier motion for summary adjudication of issues, the Lodge unsuccessfully sought dismissal of plaintiff's action on the ground that because it essentially sought to enforce her rights under the CBA, it fell within the scope of the National Labor Relations Act (NLRA) (29 U.S.C. §§ 151-169) and was therefore preempted by section 301 of the

LMRA. The court determined through summary adjudication of issues that plaintiff remained a member of the Union until several months after leaving the Lodge. The Lodge now renews its contention that plaintiff was covered by the just-cause termination provisions of the CBA and that her action is therefore preempted. We cannot agree.

Although no provision of the CBA specifically excludes the position of catering manager from coverage, and although the agreement's "Wage And Classification Schedule" lists the category "*Managers*, Head Waiters/Waitresses, Cashiers, Checkers—For Jobs in All Establishments" (italic's added), other provisions of the CBA as well as extrinsic evidence in the record support the conclusion that the position of catering manager was not covered by the agreement. The CBA gave the Lodge a right to insist that supervisory personnel not be Union members. On promoting plaintiff to catering manager, Houd demanded that she quit the Union. In a letter to her union representative, plaintiff explained that she had refused to resign her union membership because the Union maintained a pension plan for its members, while the Lodge did not have a comparable plan for its nonunion employees. Plaintiff's successor as catering manager testified that she, along with other managerial employees, did not belong to the Union. Plaintiff stated in deposition her belief that the position of catering manager was not covered by the CBA. After her employment was terminated, she sought the Union's representation in her dispute with the Lodge. The Union declined to assist her, citing the fact that she had been employed as a manager.

■ The extrinsic facts being essentially undisputed, we must make an independent determination of the issue whether the CBA covers the position of catering manager. (*Parsons* v. *Bristol Development Co.* (1965) 62 Cal.2d 861, 866 [44 Cal.Rptr. 767, 402 P.2d 839]; *Delucchi* v. *County of Santa Cruz* (1986) 179 Cal.App.3d 814, 820-821 [225 Cal.Rptr. 43].)

■ Our independent reading of the CBA and the other evidence in the record persuades us that the trial court correctly determined that the catering manager position was not covered by the CBA. In our view, the CBA provision giving the Lodge the right to require that its supervisory personnel not be Union members is inconsistent with an intent that such supervisors be covered under the agreement. Indeed, the Lodge's attempt to force plaintiff to quit the Union, although ineffectual, can only be seen as an assertion of its right under the CBA to assure that plaintiff, as a managerial employee, not be placed in a potential conflict of interest in the event of a dispute between the Lodge and Local 19. The presence of the term "Managers" in a wage scale applicable to restaurant employees does not require a different conclusion, particularly as plaintiff was salaried and not paid according to the wage

scale for shift-working managers. Moreover, the Union's refusal to represent plaintiff due to her managerial status provides some support for an inference that the CBA did not cover plaintiff. Obviously, however, had the Union erred in its interpretation of the CBA, plaintiff's remedy would be not a state law wrongful termination claim but a suit against the Lodge under the NLRA, joined perhaps with a claim against the Union for breach of its duty of fair representation. (29 U.S.C. § 185.)

The Lodge argues that merely because the parties disagree over whether the CBA covers the position of catering manager, plaintiff's action is necessarily preempted in its entirety by federal labor law. Section 301 of the LMRA provides: "Suits for violation of contracts between an employer and a labor organization representing employees in an industry affecting commerce as defined in this chapter, or between any such labor organizations, may be brought in any district court of the United States having jurisdiction of the parties, without respect to the amount in controversy or without regard to the citizenship of the parties." (29 U.S.C. § 185(a).)

■ The United States Supreme Court has construed the preemptive effect of section 301 broadly. In *Avco Corp.* v. *Aero Lodge 735* (1968) 390 U.S. 557 [20 L.Ed.2d 126, 88 S.Ct. 1235], the court decided that state law does not exist as an independent source of private rights to enforce collective bargaining contracts. When resolution of a state-law claim is substantially dependent on analysis of a collective bargaining agreement, the court has held, the claim is preempted. (*Allis-Chalmers Corp.* v. *Lueck* (1985) 471 U.S. 202, 220 [85 L.Ed.2d 206, 221, 105 S.Ct. 1904].) However, even if dispute resolution pursuant to a collective bargaining agreement, on the one hand, and state law, on the other, would require addressing precisely the same set of facts, as long as the state-law claim can be resolved without interpreting the agreement itself, the claim is "independent" of the CBA for section 301 preemption purposes. (*Lingle* v. *Norge Division, of Magic Chef* (1988) 486 U.S. 399, 409-410 [100 L.Ed.2d 410, 421, 108 S.Ct. 1877].)

The Lodge cites a number of cases illustrating the wide reach of federal preemption in state law wrongful termination cases. (See, e.g., *Newberry* v. *Pacific Racing Ass'n* (9th Cir. 1988) 854 F.2d 1142; *Young* v. *Anthony's Fish Grottos, Inc.* (9th Cir. 1987) 830 F.2d 993; *Milne Employees Ass'n* v. *Sun Carriers, Inc.* (N.D.Cal. 1989) 714 F.Supp. 1028.) ■ It contends that because plaintiff remained a member of the Union until after she left the Lodge, the subject of her action was arguably covered by the CBA termination provisions, and so was preempted. None of the cases the Lodge cites, however, involved a state-law wrongful termination claim by a union member not covered by the CBA. A federal district court has declined to find preemption of a wrongful discharge action brought by a union member who,

as a probationary employee, was not entitled to use the grievance procedures created by the CBA. (*Scott* v. *New United Motor Mfg., Inc.* (N.D.Cal. 1986) 632 F.Supp. 891, 893.) The court noted that "[i]t would be anomalous to hold that section 301 preempts [plaintiff's] state remedies because federal law provides the exclusive remedy, only then to discover that plaintiff had no remedies under federal law." (*Id.* at p. 894.) Plaintiff's situation, as a union member not covered under the CBA, is analogous to that of the plaintiff in *Scott*, who although a union member was expressly denied recourse to the grievance procedures of the CBA. We conclude, as did the federal court in *Scott*, that plaintiff's claims were not preempted by section 301 of the LMRA.[1]

The mere fact that resolution of the issue whether plaintiff was covered by the CBA entailed judicial scrutiny of its provisions does not mean that her action is preempted. That issue is necessarily a threshold question in every state-law wrongful termination action by a plaintiff who holds membership in a union. We find nothing in *Lingle* that forecloses a threshold determination of noncoverage under a CBA as a preliminary to adjudication of a managerial employee's wrongful termination claim. (Cf. *Lingle* v. *Norge Division of Magic Chef, supra*, 486 U.S. at p. 413, fn. 12 [100 L.Ed.2d at p. 423 [noting that state-law claim may depend for its resolution on both interpretation of CBA and separate state-law analysis that does not turn on CBA, citing applicability of CBA pay and benefit information to issue of damages under state-law claim].) The goal of consistency and uniformity in federal labor law is in no way frustrated by affording remedies under state law to one who is not entitled to invoke the grievance procedures of a CBA.

---

[1]We acknowledge that the court in *Young* v. *Anthony's Fish Grottos, Inc., supra*, 830 F.2d at page 1000, criticized the *Scott* court's contention that a union should not be permitted to bargain away certain rights of its junior members in return for enhanced job security for its senior members. We do not question the Union's power, in the bargaining process, to strike the balance it deems proper between the rights of different groups of covered employees. We simply conclude that no aim of federal labor law is frustrated by allowing a state-law wrongful termination claim by a union member who is not covered by a CBA. (See *Young* v. *Anthony's Fish Grottos, Inc., supra*, 830 F.2d at p. 1001 ["Since Young was covered by the CBA, her implied covenant claim was preempted by section 301 even though she may have no comparable employment protection under the CBA."].)

Because the salient issue in this case is not whether the CBA governs the claims plaintiff asserts, but whether the CBA itself applies to plaintiff, the cases the Lodge relies on are readily distinguishable. In *Miller* v. *United Airlines, Inc.* (1985) 174 Cal.App.3d 878 [220 Cal.Rptr. 684], this court held that the Railway Labor Act (45 U.S.C. § 151 et seq.) (RLA) preempts state law when the plaintiff's claims are inextricably tied to the procedures set forth in a CBA. (*Id.* at p. 889.) In *DeTomaso* v. *Pan American World Airways, Inc.* (1987) 43 Cal.3d 517 [235 Cal.Rptr. 292, 733 P.2d 614], the California Supreme Court held that RLA preemption extends to any claim premised on facts inextricably intertwined with matters subject to the grievance procedures contained in a CBA. (*Id.* at pp. 526-529.) Neither *Miller* nor *DeTomaso* decided the question whether a union member who is not covered by a CBA and its grievance procedures may bring state-law claims arising out of her termination.

2. *Opinion of Plaintiff's Economist Sufficiently Supported Compensatory Damage Award.*

Plaintiff called John Dwight Hancock to testify as an expert witness on the diminution in income she suffered as a result of her termination from the Lodge. Hancock earned a Ph.D in economics at Purdue University. At the time of trial he was employed by a firm that specializes in providing economic consulting services. The Lodge did not dispute his qualifications as an economist.

Hancock prepared a written report estimating plaintiff's lost earnings by comparing her earnings history during her employment at the Lodge with her posttermination earnings in the field of real estate sales. The report was received into evidence. Hancock projected that plaintiff would have achieved average annual pay increases of 8.8 percent had she remained at the Lodge until her retirement. Based on Bureau of Labor Standards statistics for nonsupervisory workers in the fields of accounting, real estate, and insurance, he projected an average annual increase of 1.52 percent in plaintiff's income as a real estate salesperson. Hancock testified that plaintiff's total lost income would be $418,909 if she were to continue in the work force until reaching age 65, or $354,914 if she were to work until reaching age 60. Plaintiff testified she expected to work to the age of 62.

The Lodge presented the testimony of Peter Lund, a vocational rehabilitation expert, reflecting higher earnings for real estate salespersons in California than those projected by Hancock. The Lodge also offered the testimony of Dan Gutierrez, a consulting actuary. Gutierrez criticized the theoretical underpinnings of Hancock's report, testifying that a person's income tends to rise more rapidly during the early years of his or her tenure with a particular employer and more slowly during later years. Gutierrez estimated plaintiff's total lost earnings at $95,000.

■ Citing the disparity between the opposing experts' estimates and their methodological disagreements, the Lodge urges us to reverse the judgment for lack of substantial evidence. ■ When an expert bases his or her conclusions on assumptions not supported by the record, on matters not reasonably relied on by other experts, or on factors that are remote, speculative, or conjectural, then his or her opinion lacks evidentiary value. (*Hyatt v. Sierra Boat Co.* (1978) 79 Cal.App.3d 325, 338-339 [145 Cal.Rptr. 47].) ■ However, the Lodge has failed to point out any such infirmities in Hancock's testimony. The Lodge incorrectly contends that Hancock failed to take into account plaintiff's expectation that she would retire at age 62; in fact, he provided an estimate of lost earnings assuming her retirement at age 60 and acknowledged that the estimate contained in his written report

would have to be adjusted to reflect retirement at age 62. The Lodge attacks Hancock's use of national statistics on the earnings of real estate sales personnel, but directs us to no proof that such information is of a kind not reasonably relied on by economic experts. The Lodge also asserts that Hancock admitted an error in his calculations reflecting a dip in plaintiff's projected earnings from 1990 to 1991. Its contention misstates the record. The Lodge urges that Hancock's testimony was faulty in other respects, but its complaint in essence amounts to mere disagreement with his reasoning and conclusions. .Counsel for the Lodge thoroughly explored Hancock's opinion in cross-examination.

 It is the exclusive province of the trier of fact to resolve conflicts in the evidence; an appellate court will not reverse the determination of the factfinder unless the testimony on which it is based is wholly unacceptable to reasonable minds or unbelievable per se. (*Evje* v. *City Title Ins. Co.* (1953) 120 Cal.App.2d 488, 492 [261 P.2d 279].) Hancock's testimony, although disputed by the Lodge's experts, was neither. The jury's award of $150,000 in compensatory damages falls far short of either of the earnings loss estimates Hancock provided, and indeed approaches more closely the estimate offered by the Lodge's expert, Dan Gutierrez. The inescapable inference is that the jury performed its task of evaluating the conflicting evidence. Reversal is, therefore, unwarranted.

3. *Giving of Punitive Damage Instruction Does Not Require Reversal.*

When this case was tried to the jury, the retroactivity of the decision in *Foley* v. *Interactive Data Corp.* (1988) 47 Cal.3d 654 [254 Cal.Rptr. 211, 765 P.2d 373], which eliminated tort damages for breach of the implied covenant of good faith and fair dealing, was uncertain. (Only after the entry of judgment in this action did the California Supreme Court, in *Newman* v. *Emerson Radio Corp.* (1989) 48 Cal.3d 973 [258 Cal.Rptr. 592, 772 P.2d 1059], hold that *Foley* applied retroactively to all cases not yet final as of Jan. 30, 1989.) The Lodge moved during trial to exclude the issue of punitive damages from the jury's consideration. The trial court denied the motion and gave a punitive damage instruction which was approved by the parties.

The jury was given a special verdict form. The trial court instructed that if the jury found in plaintiff's favor on either the breach of contract claim or the breach of implied covenant claim, it should then assess the amount of damages, exclusive of interest, costs, and punitive damages. Only if the jury found in plaintiff's favor on the claim of breach of the implied covenant of good faith and fair dealing, the court instructed, was it to consider whether

plaintiff had proved by clear and convincing evidence that the Lodge was guilty of oppression or malice in breaching the implied covenant.

The jury awarded plaintiff $150,000 in compensatory damages and no punitive damages.

▮ The Lodge urges us to reverse the judgment because the jury heard an instruction on punitive damages. Although after *Newman, supra,* 48 Cal.3d 973, it is clear that punitive damages are unavailable in wrongful termination actions asserting breach of express contract or of the implied covenant of good faith and fair dealing, and that an instruction permitting the jury to award punitive damages in such a case is error, the error does not necessarily demand reversal. ▮ In order to overturn a jury verdict on the basis of instructional error, a defendant must show that the error was prejudicial and resulted in a miscarriage of justice. (*Pool* v. *City of Oakland* (1986) 42 Cal.3d 1051, 1069 [232 Cal.Rptr. 528, 728 P.2d 1163].) Instructional error is considered prejudicial only when it appears probable that an improper instruction misled the jury and affected its verdict. (*Krouse* v. *Graham* (1977) 19 Cal.3d 59, 72 [137 Cal.Rptr. 863, 562 P.2d 1022].) A miscarriage of justice has occurred only if the appellate court, after an examination of the entire cause, is of the opinion that it is reasonably probable that a result more favorable to the appealing party would have been reached in the absence of the error. (*Pool, supra,* 42 Cal.3d 1051 at p. 1069.)

▮ As the jury awarded no punitive damages, it appears at first blush improbable that the erroneous instruction prejudiced the Lodge. The Lodge contends, however, that, notwithstanding the lack of apparent prejudice, the mere fact that the jury heard the punitive damage instruction must have tainted their deliberations on the compensatory damage claim and thereby resulted in a miscarriage of justice. The contention is without merit. At the beginning of trial, the court granted defendant's motion in limine to exclude evidence of emotional distress damages, as plaintiff's cause of action for emotional distress had previously been dismissed. Accordingly, her proof was confined to contractual damages representing income and benefits lost through her termination. This case is thus easily distinguishable from *Fidler* v. *Hollywood Park Operating Co.* (1990) 223 Cal.App.3d 483 [272 Cal.Rptr. 895], in which the Court of Appeal reversed a judgment awarding both contract and tort damages for constructive wrongful termination. The *Fidler* court reasoned that evidence of the plaintiff's emotional distress and the employer's egregious conduct was so likely to inflame the jury and evoke passion that the employer was denied a fair trial. (*Id.* at p. 489.) The record in this case, by contrast, is lacking in such inflammatory evidence.

A reading of the instructions given in this case confirms that the compensatory damage award could not have improperly subsumed tort elements. The trial court instructed the jury as follows: "Damages for breach of the employment contract are the amount of compensation agreed upon for the period determined to be a reasonable period that the plaintiff's employment would have continued but for the breach of the employment contract less any compensation actually earned by the employee during that period or which could have been earned in other comparable employment by reasonable effort. Such damages may include lost wages and fringe benefits. . . . [¶] If you find defendant breached the implied covenant of good faith and fair dealing, you will award to plaintiff such damages as you find were legally caused to plaintiff by such breach. Such damages are the amount of compensation agreed upon for the period determined to be a reasonable period that plaintiff's employment would have continued but for the breach of the employment contract less any compensation actually earned by the employee during that period or which could have been earned in other comparable employment by reasonable effort. Such damages may include lost wages and fringe benefits." Further, in instructing on the use of the special verdict form, the trial court stated that if the jury were to find in plaintiff's favor on the issue of liability, it must then determine the amount of damages, exclusive of interest, costs, and punitive damages, to be assessed against the defendant. Only if the jury found in favor of the plaintiff on the claim for breach of the implied covenant, the court said, was it to consider whether the plaintiff proved by clear and convincing evidence that the defendant's conduct met the standard for an award of punitive damages.

Clearly, the compensatory damage instructions set forth an exclusively contractual measure of damages. The jury was directed not to consider whether the Lodge's conduct was malicious or oppressive until it had determined whether the Lodge had breached the covenant of good faith and fair dealing implied in plaintiff's employment contract. The jury found punitive damages unwarranted by the evidence. Logically, therefore, we must conclude that the mere presence of the punitive damage instructions did not taint the verdict.

4. *Limited Admission of Evidence of Relationship Between William Houd and Janet O'Keefe Did Not Constitute Abuse of Discretion.*

Both the Lodge and plaintiff, in her cross-appeal, complain of error in the trial court's ruling limiting the admissibility of evidence of the relationship between William Houd and Janet O'Keefe. The defense moved *in limine* to exclude any such evidence, arguing that it was irrelevant and that its admission would violate the privacy rights of O'Keefe and Houd. The trial court denied the motion subject to the condition that evidence of any

romantic relationship between O'Keefe and Houd existing more than 30 days after plaintiff's termination be submitted to the trial court before presentation to the jury.

Plaintiff argued that O'Keefe and Houd had a romantic relationship, that O'Keefe disliked plaintiff, and that O'Keefe influenced Houd to fire plaintiff because she wanted the position of catering manager. She presented evidence that Houd and O'Keefe were seen arriving at and leaving work together and that they were rumored to be romantically involved. Excluded by the ruling *in limine* was evidence that Houd and O'Keefe traveled together to Hawaii more than six months after plaintiff's termination.

Plaintiff contends that exclusion of evidence of the Houd-O'Keefe relationship constituted error that prejudicially foreclosed her from proving intentional interference with her employment contract.

In order to establish a claim for interference with contract, a plaintiff must plead and prove (1) a valid and existing contract between plaintiff and a third party; (2) defendant's knowledge of the contract; (3) defendant's intentional acts designed to induce a breach or disruption of the contractual relationship; (4) actual breach or disruption of the contractual relationship; and (5) resulting damage. (*Shapoff* v. *Scull* (1990) 222 Cal.App.3d 1457, 1464-1465 [272 Cal.Rptr. 480].) Ownership and control of an entity do not by themselves relieve a defendant from tort liability for interfering with the entity's contracts. (*Collins* v. *Vickter Manor, Inc.* (1957) 47 Cal.2d 875, 883 [306 P.2d 783]); *Shapoff* v. *Scull, supra,* 222 Cal.App.3d 1457 at p. 1466.) Rather, the tort liability of an owner, director, or manager depends on whether he or she was acting to protect the interests of the entity. (*Shapoff* v. *Scull, supra,* 222 Cal.App.3d 1457 at p. 1466.) Thus, the owner of an entity enjoys a qualified privilege to terminate a contract to which the entity is a party, provided that the owner's predominant purpose in inducing the breach is to further the entity's interests. (*Id.* at. p. 1468.) And a manager likewise enjoys a qualified privilege to induce the entity to breach a contract that he or she reasonably believes to be harmful to the entity's best interests. (*Id.* at pp. 1468-1469.) A manager need not be acting solely in his or her employer's interests in order to claim the privilege; all that is required is proof that the employer's interest was one of the factors motivating his or her conduct or advice. (*Id.* at p. 1469.)

Plaintiff contends that the excluded evidence was relevant because it showed that Houd did not act out of impersonal or disinterested motives in removing plaintiff from the position of catering manager and that McFate, aware of Houd's favoritism toward O'Keefe, improperly cooperated

in breaching plaintiff's employment contract. She argues that no countervailing policy dictated exclusion of the evidence, and that exclusion was therefore erroneous.

Plaintiff's contention fails because the excluded evidence in no way supports an inference that Houd acted under O'Keefe's influence in removing plaintiff from her position. The evidence was thus irrelevant to the claim of intentional interference with contract and was properly excluded. That Houd may have been a close friend of O'Keefe's and may have travelled to Hawaii with her some six months after plaintiff's termination simply does not add up to interference with plaintiff's employment contract. Plaintiff's argument might have had some greater force if O'Keefe had replaced her as catering manager, but it was Connie Schneider, not O'Keefe, who succeeded plaintiff in that position.

Because the record contains no evidence tending to defeat the qualified privilege held by Houd and McFate, the trial court properly dismissed plaintiff's cause of action for intentional interference with contract.

Plaintiff also argues that the excluded evidence would have enabled her to impeach the credibility of Houd, who denied having a close relationship with O'Keefe. It appears, however, that her counsel did not urge this ground in opposition to the defense motion *in limine*. Moreover, as plaintiff's counsel elicited other testimony contradicting Houd's denial of a close relationship with O'Keefe, the challenged ruling did not prevent plaintiff from attacking Houd's credibility.

The Lodge contends that *all* evidence of the relationship between Houd and O'Keefe should have been excluded. Principally, it argues that the evidence was more prejudicial than probative and that its admission violated Houd's and O'Keefe's constitutional privacy rights. In reviewing the trial court's exercise of its discretion under Evidence Code section 352, we do not substitute our judgment for that of the trial court. (*Travelers Ins. Co.* v. *Lesher* (1986) 187 Cal.App.3d 169, 193 [231 Cal.Rptr. 791].) We may grant relief only when the asserted abuse constitutes a miscarriage of justice (*ibid.*), that is, when in the absence of the improperly admitted evidence a result more favorable to the complaining party would likely have occurred (*Elsworth* v. *Beech Aircraft Corp.* (1984) 37 Cal.3d 540, 554 [208 Cal.Rptr. 874, 691 P.2d 630].).

We find no abuse of discretion in the trial court's ruling admitting evidence of the Houd-O'Keefe relationship, limited to a period ending 30 days after plaintiff's termination. First, to the extent that it supported an inference that Houd allowed inappropriate factors to affect his decision to

remove plaintiff from the position of catering manager, the evidence was arguably relevant to plaintiff's claim that she was not terminated for just cause. Second, the ruling contemplated that evidence of a sexual relationship between Houd and O'Keefe, as distinct from a merely friendly or social relationship, would not be offered. This condition protected Houd's and O'Keefe's right to privacy in a way that requests for discovery of specific instances of prior sexual conduct, judicially disapproved in the cases discussed by the parties, did not. (See, e.g., *Vinson* v. *Superior Court* (1987) 43 Cal.3d 833, 841-844 [239 Cal.Rptr. 292, 740 P.2d 404]; *Boler* v. *Superior Court* (1987) 201 Cal.App.3d 467, 473-475 [247 Cal.Rptr. 185].)

*Disposition*

The judgment is affirmed. Each party shall bear its own costs on appeal.

Capaccioli, J., and Bamattre-Manoukian, J., concurred.

A petition for a rehearing was denied June 28, 1991, and the petition of appellant Los Gatos Lodge, Inc., for review by the Supreme Court was denied September 19, 1991.