[No. G029912. Fourth Dist., Div. Three. Apr. 28, 2003.]

DEPARTMENT OF FAIR EMPLOYMENT AND HOUSING, Plaintiff and Respondent, v.
VERIZON CALIFORNIA, INC., Defendant and Appellant.

**COUNSEL**

Swerdlow Florence Sanchez & Rathbun, Janet I. Swerdlow; and Michael C. Levine for Defendant and Appellant.

Paul R. Ramsey, Joseph H. Duff, Bert Bresticker and James A. Otto for Plaintiff and Respondent.

## Opinion

## SILLS, P. J.—

I

Our state's family leave act[1] allows employees in firms over a certain size to have up to 12 weeks off a year to care for an immediate family member with a "serious health condition," or simply because of the employee's own serious health condition.[2] The right is for time off without fear of losing one's job,[3] but not necessarily paid time off. The family leave act is quite

[1] The California Family Rights Acts is often given the acronym CFRA. Most acronyms, however, force readers to mentally translate them every time they appear. "CFRA" has no immediate meaning for most people the way that "FBI" does. Accordingly we will call CFRA the "family leave act." The family leave act was passed in 1991 and is set forth in Government Code section 12945.2. All undesignated statutory references in this opinion will be to the Government Code, and all undesignated references to any subdivision of a statute will be to Government Code section 12945.2.

[2] The family leave act reaches this result in a round-about way. First, subdivision (a) establishes a right to have up to 12 weeks off a year for "family care and medical leave." Subdivision (a) provides, in its entirety: "Except as provided in subdivision (b), it shall be an unlawful employment practice for any employer, as defined in paragraph (2) of subdivision (c), to refuse to grant a request by any employee with more than 12 months of service with the employer, and who has at least 1,250 hours of service with the employer during the previous 12-month period, to take up to a total of 12 workweeks in any 12-month period for family care and medical leave. Family care and medical leave requested pursuant to this subdivision shall not be deemed to have been granted unless the employer provides the employee, upon granting the leave request, a guarantee of employment in the same or a comparable position upon the termination of the leave. The commission shall adopt a regulation specifying the elements of a reasonable request."

Then, in subdivision (c), the family leave act defines "family care and medical leave" to be either leave "for reason of the birth of a child" or the "placement of a child" with the employee (see subd. (c)(3)(A)), or the serious health condition of a child of the employee (subd. (c)(3)(A)), the serious health condition of a parent or spouse of the employee (subd. (c)(3)(B)) or the employee's own serious health condition (subd. (c)(3)(C).) However, the employee's own serious health condition is *not* "on account of pregnancy, childbirth, or related medical conditions," (subd. (c)(3)(C)), a provision that differentiates the family leave act from the pregnancy leave statute, which is found in section 12945.

[3] The few reported published decisions construing the family leave act have revolved around the problems of just exactly what constitutes a serious health condition, and whether an employee gave proper notice of it. From *Gibbs v. American Airlines, Inc.* (1999) 74 Cal.App.4th 1 [87 Cal.Rptr.2d 554], we learn that ordinary colds and flus are not serious health conditions (*id.* at p. 8, citing Cal. Code Regs., tit. 2, § 7297.0, subd. (o)), and that merely telling a coworker you are suffering from flu-like symptoms (chills, fever blisters, not feeling well, taking antibiotics) is not proper notice of taking family leave, even if those symptoms turn out to be the manifestations of undetected fibromyalgia. (*Gibbs*, at p. 8.) From *Stevens v. Department of Corrections* (2003) 107 Cal.App.4th 285, 291-292 [132 Cal.Rptr.2d 19], we learn that merely writing a memo requesting some vacation time to visit elderly

explicit that, with one exception, an employer is not required to pay for time off for leave taken under the act.

The one exception is if the employee would have the right to be paid for the time *anyway*. If the employee has "accrued vacation leave or other accrued time off" or "other paid . . . time off negotiated with the employer," the employee may use *that* time for family leave, and get paid for it.[4]

■ The present appeal involves a dispute as to whether an employee, being treated by a chiropractor for a bad back and having 300 hours sick leave, had the right to take the full 12 weeks of family leave with pay but without providing verification of injury from a medical specialist. Specifically, Denise Harris, an employee of what is now Verizon, requested family leave for low-back problems on an intermittent basis in the summer and fall of 1998. There is no doubt that she was allowed the full time off and no hint that she was penalized by way of demotion or otherwise for taking the time off.

For the first four weeks Harris was paid for the time off, but in July Verizon sent her a letter saying that she needed a medical report from an orthopedist or neurologist showing total incapacitation. She never provided one. Nor did she provide X-rays from her chiropractor; indeed, it is undisputed that her chiropractor never took an X-ray of her.

Harris is an hourly worker covered by a collective bargaining agreement negotiated by the Communications Workers of America with Verizon. In

parents whose health had "deteriorated significantly" is not sufficient to constitute a request for family leave under the act either.

While discharge based on taking the family leave is obviously enough to support a tortious wrongful discharge claim (see *Nelson v. United Technologies* (1999) 74 Cal.App.4th 597, 609-612 [88 Cal.Rptr.2d 239] [dicta—the court upheld summary judgment for the employer]), once an employer presents an otherwise legitimate reason for the discharge (in *Nelson*, it was a prima facie case of time card fraud—the employee was out fighting fires when he was supposed to be at home caring for his wife and child), it is up to the employee to offer some evidence that the employer's ostensibly legitimate reason for the adverse action is merely pretextual, and failure to do so will lose the case. (See *id.* at pp. 612-615, using the approach of *McDonnell Douglas Corp. v. Green* (1973) 411 U.S. 792 [93 S.Ct. 1817, 36 L.Ed.2d 668].)

[4]Subdivision (e) provides in its entirety: "An employee taking a leave permitted by subdivision (a) may elect, or an employer may require the employee, to substitute, for leave allowed under subdivision (a), any of the employee's accrued vacation leave or other accrued time off during this period or any other paid or unpaid time off negotiated with the employer. If an employee takes a leave because of the employee's own serious health condition, the employee may also elect, or the employer may also require the employee, to substitute accrued sick leave during the period of the leave. However, an employee shall not use sick leave during a period of leave in connection with the birth, adoption, or foster care of a child, or to care for a child, parent, or spouse with a serious health condition, unless mutually agreed to by the employer and the employee."

August 1998 Harris filed a union grievance, alleging that Verizon had violated the part of the collective bargaining agreement governing paid time off for sickness and disability, i.e., article 32 of the agreement. The grievance was settled with Verizon paying Harris for any absence related to her back injury and which occurred prior to its letter telling her a specialist report was required (July 8, 1998). However, about a year and one-half later, in January 2000, the California Department of Fair Employment and Housing filed a complaint alleging that Verizon's failure to pay Harris for all absences after July 8, 1998 was a violation of the state's family leave act.

Verizon defended on, among other grounds, the proposition that Harris's state law claim was preempted by section 301 of the federal Labor Management Relations Act of 1947 (also known as Taft-Hartley, see 29 U.S.C. § 185). After a bench trial the court awarded Harris $1,092 for lost pay and another $1,000 for emotional distress. The court rejected the federal labor law preemption argument, reasoning (to quote from the statement of decision): "On the affirmative defense of preemption due to a possible involvement of federal labor law, the court finds that the references, if any required, to the collective bargaining agreement are so slight that they do not involve the court in interpreting matters more properly left to the federal court system. The court likens it more to consulting a calendar to ascertain dates than to performing some more detailed exercise in contract interpretation, which can at times be exceedingly complex and is a matter best left to the federal court." Further, the trial court entered an injunction requiring Verizon "to allow [employees] to use accrued paid time in place of time off without pay" during any approved leave pursuant to the family leave act, "if such persons are 'otherwise eligible' under the collective bargaining agreement." Verizon then filed this appeal.

## II

The terrain covering the issue of federal labor law preemption of state claims when those claims require the interpretation of collective bargaining agreements has been fairly well mapped out. The usual starting place is *Allis-Chalmers Corp. v. Lueck* (1985) 471 U.S. 202 [105 S.Ct. 1904, 85 L.Ed.2d 206]. There a union employee filed a state court lawsuit claiming insurance bad faith where the insurance was provided by a group health and disability plan, which had been incorporated by reference into a collective bargaining agreement. The employee sustained back injuries from carrying a pig to a pig roast. For a while he received disability benefits under the plan, but, supposedly, the employer ordered the plan insurer to periodically cut off his payments on various pretexts. Further, the insurer required periodic

reexamination by different doctors, which the employee thought was harassment. (*Id.* at p. 205 [105 S.Ct. at p. 1908].) His claims were only paid after he instituted the bad faith litigation in state court. While the two lower state courts agreed the case was preempted by federal law, the Wisconsin Supreme Court disagreed, and the United States Supreme Court then took the case, and held that it was preempted.

The federal high court took the state high court to task for its conclusion that the state bad faith tort was independent of "federal contract interpretation." (*Allis-Chalmers Corp. v. Lueck, supra,* 471 U.S. at p. 214 [105 S.Ct. at pp. 1912-1913].) The Wisconsin Supreme Court had made "assumptions about the *scope of the contract provision* which it had no authority to make under state law." (*Ibid.,* italics added.) Specifically, it had incorrectly assumed that the collective bargaining agreement contained no implied rights about the manner of the payment of benefits. (*Id.* at p. 215 [105 S.Ct. at p. 1913].) Not so; the collective bargaining agreement established a joint plant insurance committee which had the authority to resolve disputes about " '*any* insurance-related issues.' " (*Ibid.*) Since the "extent" of any implied duty of good faith *and* the contractual promise to pay "ultimately depend[ed] upon the terms of the agreement between the parties," both questions were "tightly bound with questions of contract interpretation that must be left to federal law." (*Id.* at p. 216 [105 S.Ct. at p. 1913].)

This last comment would later be reiterated as the court's essential holding as a rule of substantial dependence. That is, when state law claims are "substantially dependent" on an analysis of a collective bargaining agreement, there is preemption. (See *Allis-Chalmers Corp. v. Lueck, supra,* 471 U.S. at p. 220 [105 S.Ct. at p. 1916] ["We do hold that when resolution of a state-law claim is substantially dependent upon analysis of the terms of an agreement made between the parties in a labor contract, that claim must either be treated as a § 301 claim . . . or dismissed as pre-empted by federal labor-contract law."]; see also *Caterpillar Inc., v. Williams* (1987) 482 U.S. 386, 394-395 [107 S.Ct. 2425, 2430-2431, 96 L.Ed.2d 318]; *Wanland v. Los Gatos Lodge, Inc.* (1991) 230 Cal.App.3d 1507, 1516 [281 Cal.Rptr. 890].)

A fairly straightforward example of the application of the substantial dependence rule may be found in *Moreau v. San Diego Transit Corp.* (1989) 210 Cal.App.3d 614 [258 Cal.Rptr. 647]. An employer entrapped an employee into selling drugs to an informant. He resigned. After acquittal in the criminal case, the employee sought reinstatement and compensation. When those requests were refused, he brought a wrongful discharge suit.

He was a union employee covered by a "just cause" provision in his contract, so the appellate court held his state claim was preempted. The court

specifically noted that whether there was just cause to terminate his employment depended on what "just cause" meant under the collective bargaining agreement, i.e., was firing him after entrapping him just? (*Moreau v. San Diego Transit Corp., supra,* 210 Cal.App.3d at p. 624 ["even on its most general level it is apparent this case cannot be decided without resort to interpretation of the terms of the collective bargaining agreement"].)

But there are some wrinkles in the landscape that qualify the *Allis-Chalmers* rule, and these must be noted. *Lingle v. Norge Division of Magic Chef, Inc.* (1988) 486 U.S. 399 [108 S.Ct. 1877, 100 L.Ed.2d 410] demonstrated that merely because the state court must decide the same issue as a labor law arbitrator does not entail preemption. There, a wrongful discharge case centered on a "purely factual inquiry" as to whether an employer had an improper motivation for a discharge based on an allegedly false workers' compensation claim. Thus, a state claim based on the discharge did not "turn on the meaning of any provision of a collective-bargaining agreement," hence no preemption. (*Id.* at p. 407 [108 S.Ct. at p. 1882].)

*Deschene v. Pinole Point Steel Co.* (1999) 76 Cal.App.4th 33 [90 Cal.Rptr.2d 15] is our state's version of *Lingle.* In *Deschene,* a worker was fired for giving testimony in a deposition in a lawsuit brought by a former employee for asbestos exposure. In a subsequent state claim for statutory wrongful discharge, the court noted that the employer's motivation for the discharge was the key; there would also be an issue as to whether the employee gave reasonable notice of the deposition. (*Id.* at p. 42.) As in *Lingle,* because the issues were "factual ones which could be resolved without the necessity of construing the provisions of the CBA [collective bargaining agreement]," the claim was not preempted. (*Ibid.*)

While *Lingle* and *Deschene* showed that *factual* issues independent of a collective bargaining agreement are not preempted, *Lujan v. Southern Cal. Gas Co.* (2002) 96 Cal.App.4th 1200 [117 Cal.Rptr.2d 828] and *Soldinger v. Northwest Airlines, Inc.* (1996) 51 Cal.App.4th 345 [58 Cal.Rptr.2d 747] show that *legal* issues independent of the collective bargaining agreement are not preempted either.

*Lujan* was a case centered on a state law regarding the calculation of overtime pay. Meter readers under a "pay per route" plan had their overtime pay calculated by taking a flat daily rate and dividing it by the number of hours actually worked. The Department of Industrial Relations, on the other hand, contended that the overtime should be calculated, per the state law, by dividing by eight. The appellate court rejected a preemption challenge

because the dispute was not about the *interpretation of the employer's plan*, but about whether the plan *itself* complied with state law. (*Lujan v. Southern Cal. Gas Co., supra*, 96 Cal.App.4th at p. 1210.)

Could it not be said, of course, that the legal issue of plan compliance depended on figuring out exactly what the plan said, and therefore was substantially dependent on "interpretation" of the plan? Essentially, the *Lujan* court dodged that problem by noting that the parties themselves did not dispute what the plan said about how overtime was calculated. The court used the phrase "the parties do not dispute" twice on a single page in explaining why there was no need to interpret the agreement. (*Lujan v. Southern Cal. Gas Co., supra*, 96 Cal.App.4th at p. 1211: "We need not interpret the complex formula set forth in the PPR [pay per route plan] because the parties do not dispute that, in actuality, Employer computes the overtime compensation as follows:"; "Here, although the overtime compensation scheme is computed according to a complex mathematical formula in the PPR which *equates* with the federal standard, the parties do not dispute *how* overtime is calculated. Thus, even though the factual inquiry will necessarily include reference to the collective bargaining agreement, no preemption occurs.")

*Soldinger* involved a dispute about whether procedures set forth in a collective bargaining agreement *complied* with state law, rather than exactly what the collective bargaining agreement *said*. In *Soldinger*, a conservative Jew wanted time off for Passover, but couldn't get it and was fired from an airline when she took the time anyway. The court held that her state claim for religious discrimination based on a failure to accommodate her beliefs was not preempted, even though the airline asserted that it was only complying with vacation bidding procedures outlined in the collective bargaining agreement. (*Soldinger v. Northwest Airlines, Inc., supra*, 51 Cal.App.4th at pp. 368-369.) The core of the court's thinking was that the state claim did not "involve rights created by the CBA. Soldinger is not invoking contract-based rights." (*Id.* at p. 372.) That is, there was no question whether the employer "improperly administered the CBA or the bidding procedures." (*Ibid.*)

To the same effect is *Cramer v. Consolidated Freightways, Inc.* (9th Cir. 2001) 255 F.3d 683, which was based on a state law violation of a penal code provision protecting privacy (the employer there put two-way mirrors and cameras in truck stop restrooms). There was no preemption because regardless of what the collective bargaining agreement said, it obviously did not "contemplate the surreptitious videotaping" that was the basis of the state claim. (*Id.* at p. 695.)

*Livadas v. Bradshaw* (1994) 512 U.S. 107 [114 S.Ct. 2068, 129 L.Ed.2d 93] refined the problem of what is legally independent of a collective bargaining agreement by relying on an analysis of the negotiability of the right at issue. In *Livadas*, a state law imposing a penalty if wages were not paid immediately upon discharge was held not to be preempted because the "primary text" for deciding whether a worker was owed wages was the calendar, not the collective bargaining agreement. (*Id.* at pp. 123-124 [114 S.Ct. at pp. 2078-2079].) Other than the "simple need to refer to bargained-for wage rates in computing the penalty, the collective-bargaining agreement [was] irrelevant to the dispute." (*Id.* at p. 125 [114 S.Ct. at p. 2079.)

The same point was made in *Hawaiian Airlines, Inc. v. Norris* (1994) 512 U.S. 246 [114 S.Ct. 2239, 129 L.Ed.2d 203]. In that case the court held that a state claim for wrongful termination based on retaliation for whistleblowing (a mechanic refused to certify an axle sleeve on an airplane's wheel had been properly repaired when it hadn't) was not preempted by the federal law because the state protections for whistleblowers implicated "rights and obligations that exist[ed] independent of the CBA." (See *id.* at p. 258 [114 S.Ct. at p. 2246] ["Wholly apart from any provision of the CBA, petitioners had a state-law obligation not to fire respondent in violation of public policy or in retaliation for whistle-blowing."].)

Our own state's common law regarding preemption has introduced a few more wrinkles as well. In contrast with the negotiability theme in *Livadas*, Justice Turner, in *Warehouse, Processing etc. Union v. Hugo Neu Proler Co.* (1998) 65 Cal.App.4th 732 [76 Cal.Rptr.2d 814], stressed the other side of the coin. Because the *origin* of a state-created right to fees after an arbitration could be found in the collective bargaining agreement, federal law governed and there was preemption of the state claim. (See *id.* at p. 737 ["We are here concerned with an action to enforce an arbitration provision, a right specifically created by a collective bargaining agreement."].)

Perhaps the most academically interesting of our state's cases is *Wanland v. Los Gatos Lodge, Inc., supra*, 230 Cal.App.3d 1507, because it involved the threshold question of whether a collective bargaining agreement even covered the plaintiff. The case is analogous to those civil procedure opinions which solve the conundrum of the adjudication of jurisdiction itself by simply declaring that courts always, by necessity, at least have jurisdiction to determine jurisdiction.

In *Wanland*, the plaintiff had been a front desk clerk at a lodge and was promoted to catering manager. A dispute then arose as to whether she could

keep her union membership (she wanted to stay with the union's pension plan). Choosing to stay with the union, she was removed from the catering manager job. She refused reassignment and later resigned. She sued the lodge for breach of contract, and the lodge raised the issue of preemption. The court held mere disagreement over whether the collective bargaining agreement even *covered* her did not require preemption. The fact that resolution of the coverage issue might mean "judicial scrutiny" over the provision of the collective bargaining agreement did not mean the action was preempted. The *Wanland* court said the issue of coverage under a collective bargaining agreement "is necessarily a threshold question in every state-law wrongful termination action by a plaintiff who holds membership in a union." (*Wanland v. Los Gatos Lodge, Inc., supra,* 230 Cal.App.3d at p. 1517.)

## III

Here, unlike *Wanland*, there is no question as to whether the employee was covered by a collective bargaining agreement. Harris clearly was. So we now turn to the agreement.

The collective bargaining agreement here cannot be likened, as the trial judge did, to a mere calendar—unless perhaps it is the Mayan calendar. The agreement is a spiral-bound booklet, about the size of some of the later editions of the Harvard Blue Book (though easier to read). The subject of unpaid time off is covered in article 18, and the subject of paid time off is covered in article 32, which is entitled "Sickness and Accident Benefits." There is a provision which says that benefits can be either 75 percent of pay (when the employee "does not receive compensation as defined in Subsection 1.2 below"), or 100 percent of pay (if the employee does receive compensation under "said Subsection 1.2"). There are definitions of "injury" as not arising out of and during the course of an employee's occupation and a provision for calculating accumulated sick leave. There is a two-day wait for "benefits due to illness or injury" but that waiting period is waived in a number of circumstances, including if the employee already has 180 days of sick leave.

For our purposes, the crucial text involves a clause concerning management's right to investigate disabilities due to injury or other cause, and its right in its "sole discretion" to require an opinion from a nontreating physician: "Management will reserve the right to investigate any case of disability due to illness, injury or other cause, for which benefits are requested, and in its sole discretion may require an opinion from a physician

other than the one in regular attendance, or a statement from the physician in regular attendance and the payment of benefits will be governed by such investigation and opinion." In line with this text, Verizon has a policy of requiring a report from an appropriate medical specialist when leave is taken over a four-week period.

In the case before us, the determination of whether Harris was *entitled* to *paid* time off after four weeks cannot be resolved without recourse to interpreting the collective bargaining agreement, particularly management's right in its "sole discretion" to require an opinion from a "physician other than the one in regular attendance." What does that mean? It would certainly not be frivolous of Verizon to say that any time Verizon, in its sole discretion, decides it wants a second medical opinion it has the right to one, and the employee's failure to provide one means that the payment of benefits under article 32 may be cut off. In fact, such an interpretation might even be meritorious—otherwise Verizon's right to investigate using "an opinion from a physician other than the one in regular attendance" would be superfluous. If so, Harris had no right to be *paid* after she declined to submit a medical report from an orthopedist or neurologist showing total incapacitation.[5]

Or maybe not. Perhaps, under the collective bargaining agreement as properly interpreted, a note from one's chiropractor, without X-rays, is enough as from a "physician in regular attendance." Perhaps requiring a specialist, such as an orthopedist or a neurologist, is too much—after all, the collective bargaining agreement says "physician other than the one in regular attendance," not "medical specialist."

And the rather oblique phrase, "the payment of benefits will be governed by such investigation and opinion" is likewise a matter for extended cogitation. The language virtually invites individual union members to assert that any determination as to them must be consistent with other determinations in prior similar cases. But then again, it can be read, particularly in light of the words "sole discretion" above, to give the employer an absolute right to take action based on the "investigation and opinion" regardless of prior cases.

In short, it should be obvious by now that Harris's state law claim seeking to be paid for her time off after four weeks is substantially dependent on an

---

[5]One of the arguments that Verizon makes in this appeal which we do not address is that the trial court's decision was wrong on the merits as to what Harris was entitled under the collective bargaining agreement. Because we decide this case entirely on the preemption issue, we spare ourselves the headache of determining whether Verizon's interpretation is indeed meritorious.

*interpretation* of the collective bargaining agreement. As the "extent" of the manner of the employer's duties in handling insurance claims was dependent on the collective bargaining agreement in *Allis-Chalmers*, so here is the "extent" of Verizon's obligation to pay Harris for paid time off.

Our conclusion is also shown by the tests used in the opinions which did not hold that the state claims were preempted.

Pure factual inquiry independent of the collective bargaining agreement, as in *Lingle* or *Deschene*? No. Harris's claim, in contrast to the state claims in those cases, is based on her right to be paid for time off, and that right is wholly—not just substantially—dependent on the collective bargaining agreement.

Pure legal inquiry independent of the collective bargaining agreement, as in *Lujan* or *Soldinger* or *Cramer*? No. The nature of Harris's claim is not that she is entitled to paid time off *despite* what the union contract says, but *because* of what the union contract says.

Non-negotiability or independence of the state right, as in *Livadas* or *Hawaiian Airlines*? No. Here, the right under state law to the time off may be non-negotiable, but that fact is irrelevant. This is not a case of Verizon denying an employee leave in the face of state law. Here, the state law *itself* implies that the right to be paid for family leave depends on what is negotiated. Subdivision (e) of section 12945.2 specifically refers to "any other paid or unpaid time off *negotiated* with the employer" to determine the employee's right to be paid for family leave time. (Italics added.)

We need only add that, given the nature of our state family leave statute, it is clear that this collective bargaining agreement did not diminish or curtail any right afforded by the family leave statute or its federal equivalent.[6] The only *unconditional entitlement* in the family leave act is for unpaid time off; if an employee wants to be paid for it, then someone must ascertain what has been negotiated between the employer and employee, and in the case of this collective bargaining agreement, making that determination requires some judicial interpretation.

Finally, it makes no difference that Harris's complaint was drafted without reference to the collective bargaining agreement. Harris's *right* to paid family leave (as distinct from unpaid family leave) is dependent on the agreement.

[6]See 29 United States Code section 2652.

## IV

■ Technically, federal preemption does not end the inquiry. Federal law still must be applied to the claim. (See *Warehouse, Processing etc. Union v. Hugo Neu Proler Co., supra*, 65 Cal.App.4th at p. 746 [after determining federal law applied to questions of attorney fees after arbitration, court applied federal standard to reverse the judgment]; see also *Allis-Chalmers Corp. v. Lueck, supra*, 471 U.S. at p. 220 [105 S.Ct. at p. 1916] ["when resolution of a state-law claim is substantially dependent upon analysis of the terms of an agreement made between the parties in a labor contract, that claim must either be treated as a § 301 claim . . . or dismissed as preempted by federal labor-contract law"].)

Here, though, treating Harris's claim as a "section 301" claim yields the same result as outright dismissal, since section 301 claims are subject to a six-month statute of limitations. (*Moore v. Local Union 569 of the IBEW* (9th Cir. 1993) 989 F.2d 1534, 1541-1542.) There does not appear to be any dispute that if the case is preempted, Harris cannot prevail as a matter of federal law.

The judgment is therefore reversed, and the matter remanded to the trial court with directions to enter a judgment of dismissal in favor of Verizon. Appellate costs are awarded to Verizon against the department.

Rylaarsdam, J., and Moore, J., concurred.

A petition for a rehearing was denied May 28, 2003.