[Crim. No. 14516. Second Dist., Div. One. Aug. 30, 1968.]

THE PEOPLE, Plaintiff and Respondent, v. EVERETTE M. HEDRICK, Defendant and Appellant.

Albert D. Silverman, under appointment by the Court of Appeal, for Defendant and Appellant.

Thomas C. Lynch, Attorney General, William E. James, Assistant Attorney General, and Gerald H. Genard, Deputy Attorney General, for Plaintiff and Respondent.

WOOD, P. J.—In a jury trial, defendant was found guilty of grand theft. He appeals from the judgment.

Appellant contends that (1) the evidence is insufficient to support the verdict, (2) the court erred in instructing the jury, and (3) the court erred in sustaining an objection by the People to a question regarding an investigation which defendant assertedly made.

Mr. and Mrs. Searles own a shop in Beverly Hills, known as Profils Du Monde, which sells specialty goods imported from various countries, including Africa.

In February 1963, defendant came to the shop and told Mrs. Searles that he had relatives in Africa and that he could purchase merchandise, such as artifacts and art goods, in Africa for resale in the shop. He showed her letters of credit, which he had, for purchasing similar merchandise for other companies, and told her that he was going to Africa and would purchase merchandise for her if she would give him a letter of credit. He showed her several photographs of artifacts and art goods which he said he could buy for her. A letter of credit for $5,000 was obtained at a bank on the account of Profils Du Monde, designating the defendant as beneficiary, and stating his address as the New Stanley Hotel, Nairobi, Kenya. The letter of credit stated that $5,000 would be payable to defendant when he presented to the bank certain documents such as a commercial invoice, a packing list, and a bill of lading indicating that the described merchandise had been placed aboard a ship for shipment. The letter of credit was subsequently amended to permit defendant to obtain $1,000 (of the $5,000) without presenting any document.

Defendant went to Africa and obtained payment of the letter of credit from Barclay's Bank in Nairobi upon his presentation to the bank of documents, including a bill of lading which provided that two cases of wood carvings had been placed aboard a ship in Mombasa, Africa, for shipment to the Los Angeles Harbor. The bill of lading was sent to Mrs. Searles through banking channels. A ship[1] carrying the cases arrived in Los Angeles Harbor on June 24, 1963. The cases contained wood shavings, chips, logs, a salad set, and junk. (A bank officer and a shipping agent testified concerning the letter of credit transaction and the shipment of the merchandise.)

Mrs. Searles testified in part as follows: Near the time when the cases arrived on the ship at Los Angeles Harbor, defend-

[1]There was a transshipment at Rotterdam.

ant came to the shop and told her that he had two alternatives to discuss with her. He then made statements in substance as follows: He had a shipment "in customs" addressed to his wife. The bill of lading (for cases at harbor) means nothing. "It says '68 cubic feet.' That means two yards square." "Do you really think all these pages of merchandise are in two yards square?" "You give me $2,000 to pay my expenses on my family and house, or I will give you the shipment that is addressed to my wife and we will call it quits."

To this last statement, she replied: "Do you think I am stupid?", and he said: "Yes, I do." She then said: "But you signed all these with 'put on board.' You have received the money for this merchandise. How could you get away with it?" He replied: "In the Barclay Bank is a poor Indian and he was afraid for his life and I told him, 'You sign this, or else,' and he signed it; and your merchandise is sitting in docks in Mombasa, in Amsterdam, under dummy names and you will never see it unless you do what I say."

Mrs. Searles also testified that she was familiar with defendant's signature, and that signatures on documents (invoice, insurance policy, and draft—being Exhibits 5, 10, and 11) which had been presented to the Barclay Bank for payment of the letter of credit were defendant's signatures; she paid $5,000 to the Fidelity Bank, which paid the letter of credit; and she did not authorize defendant to send her chips and shavings for said money.

The mother-in-law of Mrs. Searles testified that she was at the shop when defendant came there to talk with Mrs. Searles in June 1963 after he returned from Africa, and that defendant and Mrs. Searles went to a room upstairs to talk; they talked very loud; she heard the defendant say: "If you don't give me $2,000 more, you won't see any of your money or any of your merchandise."; and, when she heard defendant say that, she telephoned her son, Mr. Searles.

Sally Jordan testified in part that she was employed at the shop in the spring and summer of 1963; she saw defendant at the shop on several occasions; in June 1963, when defendant returned from Africa, she heard defendant and Mrs. Searles, who were upstairs, discussing his trip and what had happened to the merchandise; she heard him ask her for some money, and heard him say: "Well, you won't get anything unless you give me $2,000 more."; and she also heard him say that some of the merchandise was still in Mombasa, and some of it was still in Amsterdam.

Defendant testified in substance that he is engaged in the business of importing for specific orders; he had sold African artifacts to Mrs. Searles; he made arrangements with Mr. and Mrs. Searles whereby he would fly to Nairobi, they would underwrite or co-sign his airline ticket, they would lend him $1,000 as an advance payment for the trip, and they would give him a letter of credit for $5,000 to cover purchases of merchandise in Africa for their use and distribution; he gave them a trust deed as security; the letter of credit for $5,000 was issued and subsequently was amended; a purchase order, listing the merchandise to be purchased, accompanied the letter of credit; he read the letter of credit and knew that he had to perform the conditions thereof before he could negotiate it; he performed the conditions and negotiated the letter of credit at the Barclay Bank in Nairobi, and he presented the bill of lading and other documents to that bank; he received $4,000 from the bank (and previously he had received $1,000 from the bank, when the letter of credit was amended); the merchandise was put in crates in his presence; he caused the crates of merchandise to be put on a ship in Africa; the merchandise was a selection as close as possible to the items in the purchase order; when the merchandise was put on the ship, he had no further control over it; the merchandise was inspected before it was put on the ship; he paid for the merchandise which he put on the ship; he did not see the crates which arrived at Los Angeles Harbor; when he returned from Africa, Mrs. Searles told him that she had received the bill of lading, and she asked him when the goods ''were coming in''; she asked him how he could get all the goods listed in the bill of lading into two crates, and he said they were put in by hand; they both said they were sour about the whole deal; after the ship had arrived and the crates had been unloaded, he had another conversation with Mrs. Searles; she told him there were no curios in the crates, and asked him what had happened; he made an investigation to determine what had happened; and he did not at any time perform an act for the purpose of depriving Mrs. Searles of the goods which he purchased in Africa. (When defendant was arraigned for judgment, he told the judge that the merchandise had been stolen in Mombasa.)

 Appellant contends that the evidence is insufficient to support the verdict. He argues that intent to defraud is an element of the crime of grand theft by false pretenses, and that there is no evidence of such intent—that no intent to

defraud existed when he made the representations to Mrs. Searles in the letter of credit transaction.

Section 484 of the Penal Code provides in part that every person who shall knowingly and designedly, by any false or fraudulent representation or pretense, defraud any other person of money, is guilty of theft.

"The intent to defraud is a question of fact to be determined from all the facts and circumstances of the case." (*People* v. *Caruso,* 176 Cal.App.2d 272, 278 [1 Cal.Rptr. 428]; see *People* v. *Frankfort,* 114 Cal.App.2d 680, 697 [251 P.2d 401].) "It may be, and usually must be, inferred circumstantially." (*Buck* v. *Superior Court,* 232 Cal.App.2d 153, 161 [42 Cal.Rptr. 527, 11 A.L.R.3d 1064]; *People* v. *Caruso, supra,* p. 278.) Where representations are promissory in character, it has been said that "such promises, if unconditional and made without intention of performance, may constitute actionable fraud." (*People* v. *Frankfort, supra,* p. 698; see *People* v. *Weitz,* 42 Cal.2d 338, 343 [267 P.2d 295]; *People* v. *Otterman,* 154 Cal.App.2d 193, 204 [316 P.2d 85].) "Whether a promise was dishonestly made is a question of fact for the trial court's determination upon all the evidence." (*People* v. *Frankfort, supra,* p. 698; see *People* v. *Rocha,* 130 Cal.App.2d 656, 661 [279 P.2d 836].)

In the present case, there was evidence that Mrs. Searles was induced to obtain the letter of credit for $5,000 in defendant's favor upon his representations that he could and would purchase specified merchandise (listed in documents with letter of credit) in Africa and ship the merchandise to her; that the cases which were shipped to Mrs. Searles did not contain the specified merchandise, but instead thereof the cases contained shavings, logs, chips, and junk; that defendant obtained payment of the letter of credit by the bank in Africa through dishonest means; and that he subsequently returned to California and endeavored to obtain additional money from Mrs. Searles by stating in effect that he had the merchandise elsewhere and would deliver it to her if she gave him "$2,000 more." It could be inferred from the evidence that the representations were false, that he did not intend to perform the promises, and that he used the $5,000 for purposes other than the agreed purpose of purchasing artifacts. The evidence was sufficient to support a finding that defendant intended to defraud Mrs. Searles.

Appellant further contends that the court erred in instructing the jury regarding intent to defraud. He argues

that the instructions given as to the elements of the crime of obtaining money by false pretenses, and as to the specific intent required for such crime, did not make clear to the jury that "the intent to defraud must exist at the very time the false representation is made."

One instruction was as follows: "Every person who feloniously steals the personal property of another is guilty of theft by larceny. Money is personal property. One form of larceny or theft is known as theft by false pretenses."

Another instruction was in part as follows: To constitute the crime of theft by obtaining money by false pretense, the false pretense used must be a fraudulent representation of an existing or past fact by one who knows it to be not true, or who makes the representation recklessly and without information justifying a belief that it is true, and it must be such as is adapted to induce the person to whom it is made to part with something of value. (That instruction, which is based upon CLAJIC 226, also sets forth a statement as to the elements of the crime of theft by false pretense, including the element that defendant must have intended to defraud the person named in the information as the one against whom the crime was perpetrated.)

Other instructions were in part as follows: If it is shown that the defendant practiced a fraud of a kind regarded by law as being a false pretense, and with the intent to deprive another of money, it is immaterial whether he did so in order to obtain property for himself or to accomplish its delivery to another. Upon a trial for having, with intent to cheat and defraud another, designedly by any false pretense, obtained from any person any money, the defendant cannot be convicted if the false pretense was expressed in language unaccompanied by a false token or writing unless the pretense or some note or memorandum thereof is in writing subscribed by the defendant, or unless the pretense is proved by the testimony of two witnesses, or that of one witness and corroborating circumstances.

Another instruction given (based on CALJIC 72B) was as follows: "In the case of certain crimes it is necessary that, in addition to the intended act which characterizes the offense, the act must be accompanied by a specific or particular intent without which such a crime may not be committed. Thus in the crime of theft by false pretense, a necessary element is the existence in the mind of the perpetrator of the specific intent to defraud; and, unless such intent so exists, that crime is not

committed.'' (Defendant did not request further instructions on the intent to defraud.)

The instructions which were given adequately stated the law regarding the intent required for conviction of grand theft by false pretenses. (See *People* v. *Katcher,* 97 Cal.App. 2d 209, 212-213 [217 P.2d 757].) The court did not err in instructing the jury.

■ Appellant further contends that the court erred in sustaining an objection by the People to a question regarding an investigation which defendant assertedly made to determine what had ''happened'' to the merchandise.

On direct examination, after defendant testified that Mrs. Searles told him that no curios were on board the ship, the following examination occurred:

''Q By Mr. Moss [defendant's attorney] : Did the two of you ever investigate to see what happened, together?

''A Not together.

''Q Did you ever perform an independent investigation?

''A Yes, I did.

''Q Did you ascertain what happened?

''Mr. Campbell [deputy district attorney] : Now wait a minute; hearsay and conclusions.

''The Court: What is the pending question?

'' (Record read by the Reporter.)

''The Court: I will sustain the objection.''

The direct examination was then resumed as to other matters, and no further reference was made to an investigation. As shown, the question, involved in this contention, was: ''Did you ascertain what happened?'' The question called for a conclusion by the defendant as to whether information, if any, ''ascertained'' by him was in fact ''what happened'' to the shipment. He had testified that after the merchandise was put on the ship he had no further control of it, and he did not see the crates which arrived at Los Angeles Harbor. There was no evidence that he was on board the ship or that he saw the crates after they were placed on the ship. Even if he had been permitted to answer that he had ascertained ''what happened,'' it is apparent that whatever he might have said that he ascertained, after the merchandise was on the ship, would not be information within his personal knowledge. After the objection was sustained, no attempt was made to rephrase the question, no further questions were asked concerning the purported investigation, and no offer of proof was made respect-

ing conversations or other sources of defendant's purported information. (See *People* v. *Rodriguez,* 243 Cal.App.2d 522, 526 [52 Cal.Rptr. 643].) The court did not err in sustaining the objection.

The judgment is affirmed.

Fourt, J., and Lillie, J., concurred.

A petition for a rehearing was denied September 25, 1968.