**CAP GEMINI AMERICA, INC., Appellant–Plaintiff– Counterdefendant,**

v.

**Roy A. JUDD & Software Synergy, Inc., Appellees–Defendants– Counterclaimants.**

**No. 29A02–9010–CV–620.[1]**

Court of Appeals of Indiana, First District.

Aug. 18, 1992.

1. This case was transferred to this office by order of the Chief Judge on March 19, 1992.

Henry J. Price, Jennifer L. Graham, Price & Barker, Indianapolis, John D. Proffitt, Campbell Kyle & Proffitt, Carmel, for appellant-plaintiff-counterdefendant.

Jennifer Staton Stoesz, Stoesz & Stoesz, John F. Ittenbach, Sheeks Ittenbach Craig & Gantz, Indianapolis, for appellees-defendants-counterclaimants.

RATLIFF, Chief Judge.

### STATEMENT OF THE CASE

Cap Gemini America, Inc. ("CGA") appeals the judgment for Roy A. Judd and Software Synergy, Inc. ("SSI") in CGA's action for breach of covenant not to solicit employees, interference with contractual relationships, breach of fiduciary duty of loyalty, and unfair competition, which also sought preliminary and permanent injunctive relief. CGA also appeals the judgment on the counterclaim in favor of Judd and SSI. We affirm in part and reverse in part.

### ISSUES

We consolidate and restate the issues:

1. Did the trial court err in failing to enforce the release in Judd's resignation agreement?

2. Was the parol evidence rule violated when the court permitted oral evidence which contradicted the resignation agreement?

3. Did the court erroneously award tort and punitive damages on the claim for breach of implied covenant of good faith and fair dealing?

4. Did the trial court erroneously conclude that Judd was constructively discharged?

5. Was the expert opinion on damages speculative and insufficient to support the award?

6. Was it error to award damages for waiting time penalties under CAL. LABOR CODE §§ 202–203?

7. Was the finding of $108,000,000 net assets unsupported by the evidence requiring reversal of the punitive damages award?

8. Did the court err in admitting into evidence consolidated financial statements of the parent corporation?

9. Was Judd's contractual covenant not to solicit employees for one year after termination valid and enforceable?

10. Did the court err in declaring the covenants not to compete of certain employees invalid?

11. Did the trial court abuse its discretion in awarding attorney's fees sanctions?

### FACTS

Incorporated in Wisconsin in 1974, CGA later became a wholly owned subsidiary of Cap Gemini Sogeti ("CGS"), an international corporation, in 1981. CGA provides computer software programming and analytical services for clients. Judd was employed as CGA's branch manager in Los Angeles. In 1982, Michel Berty became the president of CGA. At the May 1, 1982 meeting in Milwaukee, Wisconsin, Judd tendered his resignation as the L.A. branch manager because he was "burnt out" managing a branch office. Judd decided to

remain with CGA, though, because Berty promised him a more important position within CGA later. In writing, Berty stated to Judd that "if you are successful for the preparation of the new organization of L.A. for 1983, you continue to be in confidence with me, you agree to work as a team under my direct responsibility you will fill another position, more important for 1983, and we will prepare in 7/82." Record at 3977. A later memo from Berty put the matter off until September.

In late summer of 1982, Berty met with John Vann, one of CGA's regional vice presidents, to plan a new development group to be started January 1983, in which Judd was to participate. Vann testified that Berty wanted Judd out of L.A. and in the development group for at least six months so Berty could get rid of him. Berty feared that Judd would compete with CGA in L.A. if he left the company. Berty met with Judd in the fall of 1982 to discuss generally Judd's new position as Director of International Sales. Judd's new position in the development group was officially announced at the October 1982 meeting. Judd began working in his new position in January 1983. Although his new office was located in the corporate offices in Milwaukee, Wisconsin, Judd continued to work based in the L.A. branch office. In April 1983, Judd complained about various problems in his new position regarding communications, definition of his authority, failure to be invited to operating committee meetings, and lack of proper support and tools. Nevertheless, Judd signed an employment agreement on May 25, 1983 for the new position. The agreement provided that it was governed by California law, and at Judd's request, the noncompetition clause was deleted. The agreement contained a nonsolicitation clause and an integration clause.

After signing the employment agreement, Judd was prevented from traveling outside of the country and selling to accounts in the midwestern and eastern regions of the U.S. By July, Judd's selling area was reduced to Orange County, California.

Judd tendered his resignation on October 21, 1983. His official termination date was December 8. CGA added a release clause to the resignation agreement, which Judd signed. CGA originally agreed to pay Judd $23,558 as wages for an accrued and earned incentive bonus. Judd began operating his own computer programming and analysis business, SSI, which he had incorporated in August 1983. Judd interviewed some of CGA's Indianapolis employees for positions at SSI. In December 1983, CGA refused to pay Judd's bonus alleging that he breached his duty of loyalty during his employment.

CGA filed suit against Judd on February 2, 1984. The complaint alleged Judd breached the covenant not to solicit CGA employees, interfered with contractual relationships, breached the fiduciary duty of loyalty, and engaged in unfair competition. CGA sought damages and injunctive relief. Judd counterclaimed to recover unpaid wages, plus penalties, and damages for breaches of the employment and resignation agreements. He further alleged a tortious breach of the implied covenant of good faith, wrongful discharge, tortious interference with right to pursue a lawful business, and fraud. He sought compensatory and punitive damages. During the bench trial, Judd also requested bad faith attorney's fees for CGA's obdurate behavior. The trial court entered judgment in favor of Judd on his counterclaim in the amount of $3,000,000, plus $1,000,000 punitive damages, $23,558 for past wages, $15,-243.90 as statutory penalties, and $10,000 as bad faith attorney's fees.

Other relevant facts will be presented in our discussion of the issues.

## DISCUSSION AND DECISION

 Our review of this appeal is limited because special findings of fact and conclusions of law were entered as requested. Therefore, we review whether the evidence supports the findings and the findings support the judgment. *United Farm Bureau Mutual Insurance Co. v. Ira* (1991), Ind.App., 577 N.E.2d 588, 592, *trans. denied.* In deciding if the special

findings are clearly erroneous, we consider only the evidence which supports the judgment. *Id.* We will reverse the court's findings only if the record is devoid of facts or inferences supporting the findings. *Hunt v. State* (1990), Ind.App., 564 N.E.2d 568, 569, *trans. denied.*

## Issue One

CGA contends that the trial court erred in failing to enforce the release in Judd's resignation agreement. Pursuant to our direction on remand, the trial court entered supplemental findings of fact and conclusions of law regarding the release. The trial court refused to enforce the release for several reasons: CGA had unclean hands by its fraudulent conduct in procuring the release and was thereby equitably estopped from raising the affirmative defense of release; CGA failed to prove consideration for the release; and, CGA failed to prove that Judd was fully informed of the ramifications of the release.

■ CGA correctly relies upon California law as governing the validity of Judd's release. *Dohm & Nelke v. Wilson Foods Corp.* (1988), Ind.App., 531 N.E.2d 512, 513 (Indiana choice-of-law rule in contract actions is that the law of the state with most intimate contact governs); *Utopia Coach, Inc. v. Weatherwax* (1978), 177 Ind.App. 321, 326, 379 N.E.2d 518, 522 (where the contract was silent as to which state's law controls, state of principal employment had closest relationship to the contract and that state's law governed substantive issues). The release did not indicate which state's law governed. California had the greatest contact with the parties. Judd was terminating his employment relationship with CGA in California. California recognizes the validity of a release entered into knowingly and voluntarily which discharges a party from any claims. *See Edwards v. Comstock Insurance Co.* (1988), 205 Cal. App.3d 1164, 1167–68, 252 Cal.Rptr. 807, 809. CGA argues that Judd failed to ne-

gate the validity of the release. We disagree.

■ California law rejects contracts which exempt a party from responsibility for its own fraud, declaring such contracts to be against public policy. CAL.CIV. CODE § 1668 (West 1985). The trial court's determination of fraud, if correct, then supports the court's refusal to enforce the release which would be void as against public policy in California.

■ The trial court found that CGA committed fraud by offering Judd an illusory position to induce him to withdraw his resignation and sign a new employment agreement when CGA never intended to give Judd a more important position. *See* Record at 1462. CGA contends that a promise to perform a future act does not constitute fraud because such promise is not a representation of a present, existing fact. *See Richard P. v. Vista Del Mar Child Care Service* (1980), 106 Cal.App.3d 860, 865, 165 Cal.Rptr. 370, 372. Although this is the general rule, CGA admits that California recognizes certain instances when a promise to do a future act may serve as a basis for a fraud claim. *See* Appellant's Brief at 33. A promise made with the intention to deceive, to induce a person to enter into a contract, or without any intention of performing it, constitutes actual fraud.[2] CAL.CIV.CODE § 1572 (West 1985). A statement of what the defendant intends to do relates to an existing state of mind, and is a representation of fact. *Cicone v. URS Corp.* (1986), 183 Cal.App.3d 194, 203, 227 Cal.Rptr. 887, 892. "In other words, a promise to do something necessarily implies the intention to perform, and where such intention is absent, there is a misrepresentation of fact, which is actionable fraud." *Id.* CGA's contention that the promise was not a misrepresentation of a present fact, and therefore, not fraudulent, fails.

**2.** In *Regus v. Schartkoff* (1957), 156 Cal.App.2d 382, 389, 319 P.2d 721, 726, the elements required to assert a cause of action for fraud based upon a promise made without intent to perform were 1) a promise of material fact made without intent to perform, 2) fraudulent intent at the time made, 3) promise made to induce other to enter transaction, 4) reliance, 5) nonperformance, and, 6) injury.

■ CGA also argues that California law does not impute fraud unless a promise is unconditional and made without intention of performance. *See People v. Hedrick* (1968), 265 Cal.App.2d 392, 397, 71 Cal. Rptr. 352, 355. CGA claims that its promise to Judd was conditional. *See* Record at 3977. *Hedrick* concerns theft by false pretenses and CAL.PENAL CODE § 484 (West 1988), which are not applicable here. Moreover, we presented in footnote two the circumstances which must exist before fraud arises from a promise to perform a future act. The necessary elements do not include that the promise be unconditional. *See Regus*, at 389, 319 P.2d at 726.

■ CGA further contends that Judd failed to prove reliance upon its promise of a better position. Judd decided to withdraw his resignation from the company and forgo developing a competing venture. *See* Record at 1461. The element of reliance is satisfied.

■ The trial court found that when Judd signed the termination agreement and release, he did not have knowledge of CGA's plan to neutralize him as a competitor in the L.A. area or that CGA never intended to perform its promise of a better position. The trial court determined that Judd would not have executed the release if he had been aware of these facts. CGA argues in its supplemental briefs that the trial court's findings of fraud regarding the employment agreement do not support the conclusion that the release was procured by fraud. CGA attempts to characterize the employment agreement and the release as two separate, unrelated contracts. CGA contends that the findings support only a conclusion that the employment agreement was obtained by fraud, not that the release was procured by fraud. Therefore, CGA argues that the court's rejection of the release is unsupported by the findings. The fault with CGA's reasoning is that the release is not unrelated to the employment contract and CGA's actions. Furthermore, the trial court's determination of an invalid release is based upon the fraudulent course of conduct extending from the first meeting in May 1982

through the execution of the release. We find the record supports the court's findings and the findings support the judgment on the issue of release.

*Issue Two*

■ CGA argues that the parol evidence rule was violated when oral evidence which contradicted the resignation agreement was admitted into evidence. The parol evidence rule is statutorily defined in CAL.CIV.PROC.CODE § 1856 (West 1983). It provides that where the parties to a contract have placed the terms of their agreement in writing as a final and complete expression of their understanding, the writing is deemed integrated and may not be contradicted by evidence of any prior agreement or of a contemporaneous oral agreement. *Banco do Brasil, S.A. v. Latian, Inc.* (1991), 234 Cal.App.3d 973, 1000, 285 Cal.Rptr. 870, 885. This substantive law rule makes the written agreement "the exclusive and binding contract *no matter how persuasive the evidence* of additional oral understandings. Such evidence is legally irrelevant and cannot support a judgment." *Id.* (emphasis in original). We review this issue *de novo* because whether the parol evidence rule applies to exclude any collateral oral agreement is a question of law. *Id.* at 1001, 285 Cal.Rptr. at 885–886.

■ Admittedly, CGA's written employment agreement of May 25, 1983 contains an integration clause which supports CGA's contention that oral evidence should have been excluded regarding the parties' understanding. However, CAL.CIV.PROC. CODE § 1856(g) states that the parol evidence rule does not exclude other evidence to establish fraud. This exception permits evidence of promissory fraud to attack and nullify the main agreement if the false promise is independent of or consistent with the written agreement. *Id.* at 1009, 285 Cal.Rptr. at 891; *Continental Airlines, Inc. v. McDonnell Douglas, Corp.* (1989), 216 Cal.App.3d 388, 419, 264 Cal. Rptr. 779, 795–96. The exception does not apply where parol evidence is offered to show a fraudulent promise which varies or

contradicts the written agreement. *Latian*, 234 Cal.App.3d at 1009, 285 Cal.Rptr. at 892; *see also Oak Industries, Inc. v. Foxboro Co.* (S.D.Cal.1984), 596 F.Supp. 601, 608 (explaining fraud exception to parol evidence rule).

■■■ CGA makes conclusory statements that the collateral oral evidence varied and contradicted the written agreement but fails to demonstrate such. *See* Appellant's Brief at 37, 38–39. The evidence that CGA objected to as violating the parol evidence rule was Judd's testimony that before he signed the employment agreement, Berty promised him a new job within CGA as Director of International Sales, which promotion would be very high level within the corporation and require extensive travel in Europe. Record at 3457–59. CGA made a continuing objection when Judd testified that travel in all of CGA's regions was discussed with Berty. Record at 3461. Further objections were entered on the same grounds when Judd testified as to the pre-contract conversations with Berty concerning travelling in the new position, working with the top Fortune 50 companies, and his salary. Record at 3467–69. The written agreement employed Judd as the Director of International Sales without delineating the duties of the position or limiting the travelling area. The contested evidence was not inconsistent with the written agreement, but presented additional facts ʋhich were independent of and consistent with the written agreement. The trial court did not err in admitting Judd's testimony.

CGA also claims the court erroneously relied on parol evidence to determine the effective date of Judd's resignation as October 24, 1983, when the Resignation Agreement states that the termination date was December 8, 1983. CGA is confusing the terms "termination date" and "resignation date." The resignation agreement provides: "I respectfully request that effective Monday, October 24, 1983, my daily work end, and I begin my vacation, as earned and accrued, for 241 hours. My termination date shall be December 8, 1983." Record at 3116. The resignation agreement clearly provides October 24, 1983 as the resignation date and December 8, 1983 as the termination date. We find no error in the court's findings and conclusions on this issue.

*Issues Three and Four*

CGA next argues that the court erroneously awarded tort and punitive damages on the claim for breach of implied covenant of good faith and fair dealing. CGA also challenges the trial court's conclusion that Judd was constructively discharged. These two issues are moot because Judd concedes that the court did not award compensatory or punitive damages on either of these grounds. *See* Appellee's Brief at 36–37.

*Issue Five*

■■■ CGA argues that the expert opinion on damages was speculative and insufficient to support the award of compensatory damages for fraud. First, we must address whether California or Indiana law applies to the issue of damages. CGA correctly contends the law of the forum governs the choice-of-law questions in contract cases. *See Issue One.* However, Judd was successful at the trial level on his tort claim of fraud and received damages therefor. We then must determine Indiana's choice-of-law rule on damage issues in tort claims. Formerly, Indiana adhered strictly to the traditional choice-of-law rule that the law of the place where the tort was committed governed substantive matters, including the type, measure, and amount of damages. *See Maroon v. State, Department of Mental Health* (1980), Ind.App., 411 N.E.2d 404, 409–10;[3] *Western Smelting & Metals, Inc. v. Slater Steel, Inc.* (D.C.Ind.1985), 621 F.Supp. 578, 583–84 (the law of the place where damages were suffered governs damages issues in claims for fraud and misrepresentation in Indiana). However, our supreme court has since retreated from such strict application to the *lex loci* rule.

---

**3.** We note this writer's concurring opinion in which he rejected the inflexible application of

avoid anomalous results. *See Hubbard Manufacturing Co. v. Greeson* (1987), Ind., 515 N.E.2d 1071, 1073–74. In *Hubbard,* Indiana adopted a two-step choice-of-law rule:

> "if the place of the tort has extensive connection with the legal action, the traditional rule of *lex loci delecti* ("the law of the place of the wrong") applies; however, if the place of the tort bears little connection to the legal action, a court may consider other factors, such as: (1) the place where the conduct causing the injury occurred; (2) the residence or place of business of the parties; and (3) the place where the relationship is centered."

*Thomas v. Whiteford National Lease* (1991), Ind.App., 580 N.E.2d 717, 718 (citation omitted); *see Gollnick v. Gollnick* (1989), Ind., 539 N.E.2d 3, 4 (affirming court of appeals' rehearing decision interpreting the modified choice-of-law rule announced in *Hubbard*). Here, the fraud was committed in Wisconsin when Berty promised Judd a more important position within CGA. Record at 5181. Wisconsin, though, has little connection to the legal action. CGA was incorporated in Wisconsin and had located its corporate headquarters there, but otherwise, Wisconsin had no connection with Judd. Judd was employed by CGA in its L.A. branch and was mostly working in California. Judd's relationship with CGA was centered in California. Applying the modified choice-of-law rule, we find that California law governs the issue of damages.

 California generally does not award damages for lost profits of a new business because the lack of income and expense experience renders anticipated profits too speculative to meet the reasonable certainty necessary to support an award of such damages. *Maggio, Inc. v. United Farm Workers,* 227 Cal.App.3d 847, 869, 278 Cal.Rptr. 250, 264, cert. denied (1991), —— U.S. ——, 112 S.Ct. 187, 116 L.Ed.2d 148; *Berge v. International Harvester Co.* (1983), 142 Cal.App.3d 152, 161, 190 Cal.Rptr. 815, 822; *Fisher v. Hampton* (1975), 44 Cal.App.3d 741, 748, 118 Cal.Rptr. 811, 815; *Gerwin v. South-*

*eastern California Association of Seventh Day Adventists* (1971), 14 Cal.App.3d 209, 221, 92 Cal.Rptr. 111, 118–119; *MacMorris Sales Corp. v. Kozak* (1968), 263 Cal. App.2d 430, 442, 69 Cal.Rptr. 719, 726. However, the "new business" rule is not a hard and fast one, and loss of prospective profits may be recovered if the evidence shows with reasonable certainty *both* the *occurrence* and the *extent* thereof. *Id.;* *Sanchez–Corea v. Bank of America* (1985), 38 Cal.3d 892, 907, 215 Cal.Rptr. 679, 689, 701 P.2d 826, 836. Uncertainty as to *fact* of whether any damages were sustained at all is fatal to recovery, but uncertainty as to *amount* is not. *Fisher,* 44 Cal.App.3d at 748, 118 Cal.Rptr. at 815; *see Berge,* 142 Cal.App.3d at 161, 190 Cal.Rptr. at 822 (if damages are established, lost profits will not be denied because they are not mathematically precise). After examining the record in accordance with our strict standard of review where special findings have been entered, we find that the court's findings are not supported by the record and that Judd failed to demonstrate with reasonable certainty the occurrence of lost profits.

 Judd presented the expert testimony of Dr. David Vinso in an attempt to establish lost profits and an estimate of the amount of such damages. Applying economic analysis and using documents provided by Judd, Dr. Vinso projected Judd's loss of prospective profits to be $9.5 million. To arrive at this figure, Dr. Vinso made several assumptions. First, Dr. Vinso assumed that Judd was able to begin competing with CGA in May 1982 as Judd told him. Record at 4825. This assumption is not supported by the record. If an expert's conclusions are based on assumptions not supported by the record, on matters not reasonably relied on by other experts, or on factors that are remote, speculative or conjectural, then the opinion lacks evidentiary value. *Wanland v. Los Gatos Lodge, Inc.* (1991), 230 Cal.App.3d 1507, 1518, 281 Cal.Rptr. 890, 896. Judd testified that he decided to form SSI on July 30 or 31, 1983. Record at 3120. He filed the articles of incorporation on August 1, 1983.

Record at 3266. He stated he made plans for SSI at the end of August 1983 and interviewed prospective employees in November 1983. Record at 3123, 3215, and 3218. These same steps would have supported the assumption that Judd was able to compete in May 1982 if they had been initiated prior to May 1982. Judd presents no evidence to support the assumption that he was ready to compete in May 1982 other than his own statement. In support of our conclusion, we note that contrary to Judd's bald declaration that he was ready to compete in May 1982, Judd made statements that he was "burnt out" in 1982, contemplating semi-retirement, and considering a vacation. Record at 4390-92, 4396, and 4404. Judd failed to present evidence supporting his assertion that he was ready to compete with CGA in May 1982. Therefore, Dr. Vinso's calculations of lost profits from May 1982 are invalid. *See id.; Kuffel v. Seaside Oil Co.* (1970) 11 Cal.App.3d 354, 365-67, 90 Cal.Rptr. 209, 216-17 (unwarranted assumptions result in erroneous conclusions).

Furthermore, in calculating lost profits, Dr. Vinso failed to allocate any fixed costs in hiring staff for SSI. Record at 4827. Dr. Vinso also admitted that when he made his projections, he did not identify any of the other competitors in the business besides CGA and did not know how many competitors existed. Record at 4829. Dr. Vinso did not explore whether sources of customers or employees were available to SSI in May 1982. Dr. Vinso's assumptions were invalid because they were based upon incomplete facts. *See Wanland,* 230 Cal.App.3d at 1518, 281 Cal.Rptr. at 896; *Kuffel,* 11 Cal.App.3d at 365-67, 90 Cal.Rptr. at 216-217 (assumptions erroneous where expert 1) assumed that company would have sold as much as prior year, without comparing prevailing market conditions and similar factors, 2) assumed overhead would not change, 3) ignored potential outside changes in business in predicting future growth of business).

Judd's claim for lost profits also fails for other reasons. Lost profits may be proved with evidence of profits made by similar businesses operating under similar conditions when dealing with a new business. *Sanchez-Corea,* 38 Cal.3d at 907-08, 215 Cal.Rptr. at 689-90, 701 P.2d at 836-37; *Berge,* 142 Cal.App.3d at 162-63, 190 Cal.Rptr. at 822-23. Dr. Vinso figured the $9.5 million by utilizing actual revenue data of SSI from January 1984-January 1986. Record at 4804-05. He also compared CGA's L.A. branch figures from February 1978-January 1981 to compute projected losses of SSI. Record at 4795-97. Dr. Vinso calculated an actual 13.5% growth rate for CGA in the 1979-81 period. However, Judd disregarded CGA's actual profits and growth rate after 1982 and assumed a constant growth rate of 13.5% after 1982 based upon the 1978-1981 growth rate. Record at 4804-06. It is unreasonable to use hypothetical figures when actual figures were available. *Cf. Kuffel v. Seaside Oil Co.* (1977) 69 Cal.App.3d 555, 563, 138 Cal.Rptr. 575, 579, *appeal after remand* (reasonable to use actual figures of another similar dealer in the same area to make projections for lost profits).

Dr. Vinso further assumed that SSI would have obtained 40% of the profits that Dr. Vinso hypothesized CGA could have made in May 1982. Record at 4806-07, 4835. For June and July 1982, Dr. Vinso allowed SSI profit rates of 60% and 80% of the hypothetical CGA profit rate. Record at 4807. Dr. Vinso thereafter assumed an 80% profit rate for SSI for the remainder of Judd's estimated work life. *Id.* Dr. Vinso admitted that the profit rates projected for SSI were based only upon Judd's statements that he could obtain 80% of CGA's revenues within ninety days of operation. Record at 4837. Dr. Vinso stated that his opinion was based upon Judd's ability to verify that SSI could actually generate such revenues. Record at 4843. If the percentage was not verified by Judd, Dr. Vinso's $9.5 million projection would change. Record at 4843-44. Judd has not substantiated that SSI could generate such percentages of revenues. In fact, SSI's actual growth rate did not approach the 80% estimates. *See* Record at 4870. Although a business's later profitable oper-

ation may be probative of the determination of lost profits, it is not a sole or mandatory requirement and is only one of several factors useful in determining whether the lost profits may be determined with sufficient certainty to be awarded or must be rejected as too speculative. *Maggio*, 227 Cal.App.3d at 870, 278 Cal.Rptr. at 264. Based upon the erroneous assumptions as discussed throughout this opinion, SSI's actual profit, which is considerably lower than the projected estimate, is not probative in determining whether the lost profits could be determined. The problems with the expert's underlying assumptions render the lost profits calculation too speculative. *See Wanland*, 230 Cal.App.3d at 1518, 281 Cal.Rptr. at 896. Judd failed to present any evidence which would support an award for lost profits.

Lastly, we refer to *Sanchez–Corea*, 38 Cal.3d 892, 907–08, 215 Cal.Rptr. 679, 689–690, 701 P.2d 826, 836–37. In *Sanchez–Corea*, the company was not a new or unestablished business as we are faced with here. However, the market for which Sanchez–Corea sought lost profits was a newly developing one. The value of the company's start in the business was shown by evidence of the established reputation and the actual growth in sales during a three-year period. The expert witness on growth potential for small business projected company's future profitability. The projection and the reliability of the information and the conservative nature of the estimates were confirmed by the subsequent experience of the company itself and the earnings of other competing companies. The company succeeded in attracting business and achieved sales in excess of the expert's projected profits one year sooner than expected. Comparisons to other companies' earnings were not invalid although the company had smaller financial resources because the lack of financial resources resulted from the defendant's wrongdoing. The jury's verdict awarding $1,000,000 as compensatory damages for lost profits was supported by substantial evidence. *Id.*

At first glance, SSI appears to be similar to the company in *Sanchez–Corea:* Judd had a good reputation in the business and showed actual profits once SSI began operating. However, the information upon which Dr. Vinso's projected losses were based was speculative and cannot be justified solely by subsequent events. The assumptions made were not based upon facts supported by the record. *See Wanland*, 230 Cal.App.3d at 1518, 281 Cal.Rptr. at 896. The subsequent actual earnings of CGA do not confirm the reliability of the projections, but show them to be questionable. Unlike *Sanchez–Corea*, Dr. Vinso's comparison of SSI to CGA is not valid as SSI had smaller financial resources, which were not due to CGA's wrongdoings, and SSI was not operated similarly to CGA. For example, SSI hired independent contractors instead of employees as salespersons. Dr. Vinso agreed that different costs were incurred because of the dissimilarities in the sizes of SSI and CGA and their modes of operation. We find that *Sanchez–Corea* supports the opposite result in the present case—the damages award for lost profits was not supported by the evidence because the expert's projections were based upon assumptions unsupported by the facts.

 Consequently, the award of punitive damages must also be reversed. Punitive damages must bear a reasonable relation to the actual injury suffered. *Gagnon v. Continental Casualty Co.* (1989), 211 Cal.App.3d 1598, 1602, 260 Cal.Rptr. 305, 307. "It is settled that punitive damages cannot be awarded unless actual damages are suffered." *Id.* at n. 5 (citations omitted). Since no actual injury was proven regarding lost profits, punitive damages cannot stand.

*Issue Six*

 CGA also contends that it was error to award damages for waiting time penalties under CAL.LABOR CODE §§ 202–203 (West 1989 and Supp.1992). CGA first claims the court varied the terms of the resignation agreement by considering parol evidence and labeling the $23,558 incentive bonus as "wages." *See* Record at 3116. CGA does not appeal that it owes

the amount of $23,558 but contends that since the bonus is not "wages," the waiting time penalties of §§ 202 and 203 are not triggered. CGA's argument is without merit. CAL. LABOR CODE § 200 (West 1989) defines "wages" as "all amounts for labor performed by employees of every description whether the amount is fixed or ascertained by the standard of time, task, piece, commission basis, or other method of calculation." Wages may be determined on the basis of time spent in service or by work done. *In re Hollingsworth's Estate* (1940), 37 Cal.App.2d 432, 436, 99 P.2d 599, 601. Wages include not only the periodic monetary earnings of the employee but also the other benefits to which he is entitled as part of his compensation. *Triad Data Services, Inc. v. Jackson* (1984), 153 Cal.App.3d Supp. 1, 10, 200 Cal.Rptr. 418, 423 (citation omitted). As the incentive bonus was computed based upon work done, it is "wages" under § 200. CGA's contention that the trial court impermissibly relied upon parol evidence in calling the bonus "wages" is without merit.

 CGA further contends that Judd waived his right to collect the waiting time penalties. § 202 provides in relevant part:

"If an employee ... quits his employment, his wages shall become due and payable not later than seventy-two hours thereafter, unless the employee has given seventy-two hours [sic] previous notice of his intention to quit, in which case the employee is entitled to his wages at the time of quitting."

Here, Judd and CGA mutually agreed, and the resignation agreement so reflects, that the payment of the incentive bonus would be postponed until January of 1984. Record at 3116–17. The record fails to disclose evidence that Judd agreed to forgo payment; rather, the payment was merely postponed. Indeed, CGA concedes this. Appellant's Brief at 54. Thus, CGA's argument that Judd waived his right to receive the waiting time penalties fails.

 CGA argues that it did not "willfully" fail to pay Judd under § 203. This section states in part:

"If an employer willfully fails to pay, without abatement or reduction, in accordance with Sections 201, 201.5, and 202, any wages of an employee who is discharged or who quits, the wages of such employee shall continue as a penalty from the due date thereof at the same rate until paid or until an action therefor is commenced; but such wages shall not continue for more than 30 days."

The purpose of § 203 is to compel the prompt payment of earned wages; it is to be given a reasonable but strict construction. *Barnhill v. Robert Saunders and Co.* (1981), 125 Cal.App.3d 1, 7, 177 Cal. Rptr. 803, 806. To recover under this section, an employee must show that the employer owes a debt to the employee and refuses to pay it. *Id.* To be at fault within the meaning of the statute, the employer's refusal to pay need not be based on a deliberate evil purpose to defraud an employee of the wages which an employer knows to be due; rather, as used in § 203, "willful" means merely that the employer intentionally failed or refused to perform an act which was required to be done. *Id.*

The facts in the case at bar show that CGA refused to pay the wages due to Judd. CGA agreed in the resignation agreement that it would pay the wages, but at a later date than that required by § 202. Agreeing to pay the wages due at a later time, however, in no way negates CGA's ultimate obligation to pay. Rather, CGA's obligation did not change, but was merely postponed January 1984. Because CGA was required to pay Judd the wages and failed to do so, it violated § 203. The trial court therefore correctly found that Judd was entitled to the wages owed from CGA.

 CGA contends, however, that the trial court did not have the authority to order the payment of the wages under § 203 because this section is penal, and as such, may not be enforced by any state other than California. *See Huntington v. Attrill* (1892), 146 U.S. 657, 669, 13 S.Ct. 224, 228, 36 L.Ed. 1123, 1128 (courts of one state may not enforce penal laws of another state). Therefore, CGA argues, the trial court lacked subject matter jurisdiction to

determine the wages owed to Judd. We disagree with CGA's interpretation of § 203.

Although CGA claims that § 203 is penal, and thus unenforceable by Indiana courts, there is a significant difference between statutes which are strictly penal, requiring the payment of penalties to a state, and statutes which are penal in nature, and require payment to an individual for damages owed. *See Huntington*, 146 U.S. at 667, 13 S.Ct. at 227, 36 L.Ed. at 1127–28 (penal laws, strictly speaking, are those imposing punishment for offenses committed against the state; statutes giving private action against wrongdoer are sometimes spoken of as penal in nature, but in such cases it has been pointed out that neither liability imposed nor remedy given is strictly penal). § 203 is penal in nature because it requires the penalty to be paid to the party wronged, in this case Judd, and not the state. Thus, § 203 may be enforced in Indiana without offending the mandate of *Huntington* precluding the enforcement of one state's penal laws in another state. *See Huntington*, 146 U.S. at 669, 13 S.Ct. at 228, 36 L.Ed. at 1128; *see also Czechowski v. Tandy Corp.* (N.D.Cal.1990), 731 F.Supp. 406, 410 (§ 203 provides for award of statutory penalties when employer "willfully fails to pay" wages due upon termination); *Hale v. Morgan* (1978), 22 Cal.3d 388, 401, 149 Cal. Rptr. 375, 383, 584 P.2d 512, 520 (§ 203, while imposing daily penalty for continuing failure to pay wages due at employee's termination, nonetheless limits penalty to thirty (30) days).[4] The trial court's award of wages and waiting time penalties under §§ 202 and 203 was proper.

*Issue Seven and Eight*

CGA declares that the court's finding that CGA had over $108,000,000 net assets is clearly erroneous. The only evidence of CGA's financial information was contained in the 1984 Annual Report of CGS which consolidated financial information of CGS and its subsidiaries. Record at 4171–4224.

CGA contends the admission of the CGS report was error. At trial, CGA objected to the admission of the report claiming it was irrelevant because it was a consolidated report for CGS, not just CGA. Record at 4169.

▮ Generally, evidence of the wealth of the parent corporation is irrelevant and inadmissible in assessing punitive damages against a subsidiary corporation. *Miller Brewing Co. v. Best Beers of Bloomington, Inc.* (1991), Ind.App., 579 N.E.2d 626, 642 (transfer pending). Financial documents regarding the wealth of a parent corporation are admissible if the subsidiary was merely an instrumentality of the parent corporation. *Id.* Judd does not argue that CGA was a mere instrumentality of CGS, nor did the trial court so hold. Although CGA is a wholly owned subsidiary of CGS, *see* Record at 4170, the corporate form will not be disregarded solely because a corporation is the parent of another. *See Miller Brewing*, 579 N.E.2d at 641. Where no showing is made that the corporate veil should be pierced because the subsidiary was simply an alter ego or mere instrument of the parent, the wealth of the parent corporation cannot be considered for any purpose. *Id.* at 642.

▮ Here, the report reflects that the total revenue for CGS was $188,000,000 and the net income was $10,000,000. Record at 4171. The trial court found that CGA had net assets over $108,000,000. The trial court admitted the report although no argument was made for piercing the corporate veil. The error was not harmless where the court relied upon the CGS report to determine punitive damages. A verdict for punitive damages against a defendant based on the wealth of someone else is plain error. *Id.* at 643. We agree with CGA that the trial court erred in admitting the report and that the punitive damages award must be reversed on this additional ground. No remand is neces-

---

**4.** CGA's contention that *Hale* states that § 203 is clearly penal by analogy to CAL.CIVIL CODE § 789.3 (West 1982) is erroneous; rather, the *Hale* court briefly mentions § 203 in its survey of California statutes providing civil penalties. *See Hale,* 22 Cal.3d at 401, 149 Cal.Rptr. at 383, 584 P.2d at 520.

sary on this issue as we concluded in *Issue Five* that no proof of punitive damages was established under the fraud claim.

*Issue Nine*

 The trial court determined that Judd's contractual covenant not to solicit CGA employees for one year after termination was invalid. CGA claims otherwise. The nonsolicitation clause in Judd's employment agreement provided:

"Employee agrees that he will not ... aid or endeavor to solicit or induce then remaining employees of [CGA] ... to leave their employment with [CGA] ... in order to accept employment with another person, firm or corporation[.]"

Record at 3106. Although the trial court's finding cites the noncompetition clause instead of the nonsolicitation clause, we find the misstatement did not affect the court's conclusions. The trial court's conclusion was that the prohibition on solicitation of *any* employee within [CGA] was overly broad in its scope, and thus, invalid under California and Indiana law. Record at 1466 (emphasis in original). California law controls this contract issue as dictated by Judd's employment agreement. *See Barrow v. ATCO Manufacturing Co.* (1988), Ind.App., 524 N.E.2d 1313, 1315 (parties' contract may specify the choice of law).

CAL.BUS. & PROF.CODE § 16600 (West 1987) mandates: "Except as provided in this chapter, every contract by which anyone is restrained from engaging in a lawful profession, trade, or business of any kind is to that extent void." Judd cites several cases which invalidated noncompetition covenants based upon § 16600. CGA contends, though, that the nonsolicitation of employees clause was valid under California law, citing *Loral Corp. v. Moyes* (1985), 174 Cal.App.3d 268, 219 Cal.Rptr. 836. The *Loral* court distinguished a noninterference agreement not to solicit former co-workers to leave the employer from noncompetition agreements, which are void in California. *Id.* at 276–79, 219 Cal.Rptr. at 841–43. In doing so, the *Loral* court reasoned that the potential impact on trade must be considered before invalidating a

noninterference agreement. *Id.* at 278, 219 Cal.Rptr. at 843. The *Loral* court found that a noninterference agreement which prohibited the raiding of a corporation's employees did not violate § 16600. The *Loral* restriction was reasonable where it was sought to maintain a stable work force and enable the employer to remain in business. The court found that the restriction limited the former employee's business in a small way and had no overall negative impact on trade or business. *Id.*

We find the facts of this case to be distinguishable from *Loral* and conclude that the nonsolicitation clause was an unreasonable restriction on business. CGA attempted to prevent Judd from hiring CGA employees regardless of their location. Judd had primarily worked in California for CGA, but the nonsolicitation covenant was not limited to CGA employees in California. It was unreasonable to extend the protection of maintaining a stable work force to CGA's branch in Indianapolis when Judd was based in California. Therefore, we agree with the trial court that the nonsolicitation covenant was invalid.

 In addition, the *Loral* court further stated that the former employee was not prohibited from receiving and considering applications from employees of his former employer, even though he could not solicit their applications. *Id.* at 279, 219 Cal.Rptr. at 844. In *Loral,* the former employee admitted violating the noninterference agreement, but denied the agreement was valid. *Id.* Here, the record shows that Judd placed anonymous advertisements in an Indianapolis newspaper seeking to hire computer programmers. Record at 2082, 2481, 2545–47, 2680–81, and 3896. Under *Loral,* Judd was not precluded from accepting their applications and hiring them where he had not directly solicited applications from CGA's employees. Therefore, regardless of whether the nonsolicitation covenant was valid, it was not violated by Judd's conduct.

*Issue Ten*

CGA's complaint asserted that Judd interfered with contracts of its employees.

1288

Seven of CGA's computer analysts quit their employment in Indianapolis with CGA in January 1984 and were hired by Judd to work at SSI in California.

The analysts's employment agreements contained the following covenant not to compete with CGA in all areas served by the Indianapolis branch:

"I agree, during my employment, or for a period of one year after my employment terminates with [CGA], not to compete with, and not to engage in the same or similar business as that conducted by, [CGA], either directly or indirectly, for or on behalf of any customer of [CGA] within the area served by any Branch Office of the company in which I was employed at the time of termination or were so employed within one year prior thereto, without the written approval of an Executive Officer of [CGA], which approval shall not be unreasonably withheld."

Record at 2646, 2537, 3082, 3086, 3089, 3092, and 3095. The trial court declared the covenants not to compete in the analysts's contracts to be overly broad in scope and thereby invalid under Indiana law, and therefore, found no interference by Judd with the CGA employment contracts. Record at 1468. CGA contends that the court erred in finding the noncompetition covenants invalid.

 In Indiana, a noncompetition covenant may be valid to prevent an employee from using his employment relationship for his own benefit or for the benefit of a competitor. *Commercial Bankers Life Insurance Co. v. Smith* (1987), Ind. App., 516 N.E.2d 110, 112, *trans. denied.* Noncompetition agreements will be enforced to the extent their terms are reasonable as to time, place, and scope. *Franke v. Honeywell, Inc.* (1987), Ind.App., 516 N.E.2d 1090, 1092, *trans. denied.* The trial court determined that CGA's noncompetition covenants with the seven analysts were broader in scope than the geographic area in which the employees actually worked, and therefore were invalid. The Indianapolis branch served Indiana, Ohio, and Kentucky, yet the analysts did not perform services in all three geographic areas. Record at 2526, 2539, 2570, 3840, and 4515–16. Accordingly, the noncompetition covenants were unreasonable and invalid. *See Smith*, 516 N.E.2d at 114–115 (covenant restricting competition in state of Indiana was unreasonable where employee worked primarily in Northern Indiana).

*Issue Eleven*

 Lastly, CGA contends that the trial court abused its discretion in awarding attorney's fees sanctions. The trial court awarded Judd $10,000 attorney's fees for CGA's obdurate behavior. The general rule in Indiana is that each party must pay his own attorney's fees in the absence of a statute or agreement providing otherwise. *Cox v. Ubik* (1981), Ind.App., 424 N.E.2d 127, 129. The "obdurate behavior" exception to the rule is that a trial court may award attorney's fees where a party has acted in bad faith. *Id.* To satisfy the "obdurate behavior" exception, the conduct must be vexatious and oppressive in the extreme. *Id.* The exception was designed to reimburse a prevailing party to baseless litigation. *Id.* Thus, the obdurate behavior exception has been limited to situations in which the defendant has been forced to defend a baseless claim. *Matter of Estate of Kroslack* (1991), Ind.App., 570 N.E.2d 117, 120. We conclude that the award of attorney's fees under the "obdurate behavior" exception must be reversed because the findings fail to support that CGA's claims were baseless. *See United Farm Bureau Mutual Insurance Co.*, 577 N.E.2d at 592 (judgment affirmed if the findings are not clearly erroneous and support the judgment).

*Conclusion*

We affirm the trial court's conclusion that the release was void and unenforceable. However, the awards of compensatory and punitive damages are reversed due to Judd's failure to show evidence of lost profits. We uphold the damages award for waiting time penalties pursuant to CAL. LABOR CODE §§ 202 and 203. We also affirm the trial court's decision that the nonsolicitation covenant was invalid. Fi-

nally, we reverse the award for attorney's fees sanctions.

Affirmed in part and reversed in part.

ROBERTSON and SHIELDS, JJ., concur.